## THE HARLAN & HOLLINGSWORTH COMPANY

### *vs.*

## SAMUEL D. PASCHALL.

New Castle, Sept. T. 1882.

*Act for establishment of wharf line in Christiana River within City of Wilmington; constitutionality and enforcement of; riparian owners; obstructions to navigation; public nuisance with special private damage; purpresture; relief in equity by injunction.*

1. The Act of February 6, 1855, and its supplements, providing for the fixing of a wharf line in the Christiana River within the City of Wilmington, and prohibiting the construction of any pier or other obstruction beyond such line, is not unconstitutional on the ground that it provides for the taking of private property without compensation.

2. Such Act does not provide for a taking of private property, but only for the regulation of the use of private property for the maintenance of the river as a public navigable stream.

3. A riparian proprietor or owner of land fronting upon a navigable river holds to the low water mark.

4. Obstructions in navigable rivers, made in aid of commerce, which do not materially injure the navigation, are not nuisances.

5. The court cannot pronounce a simple obstruction in a navigable river a nuisance; it is a fact to be found.

6. When wharves, constructed by a riparian proprietor on a navigable river, do not extend below low water mark, they are not necessarily public nuisances in fact, and will not be interfered with by courts of equity, unless it be ascertained that the rights of the public are thereby injured.

7. The term "purpresture" is applicable to a wharf built upon the shore of a navigable stream by the proprietor of the soil only when the wharf is carried so far into the channel, or so far beyond the owner's title, as to become a nuisance.

8. Every branch and commodity of commerce, whether extended or limited in degree, and every aid and facility intended for its advancement, is entitled to equal protection and an equal status in the right of enjoyment of free navigation, and in furnishing the facilities and aids thereto.

9. In the case of a purpresture made unlawful by statute, and for which a specific remedy is supplied by the statute, courts of equity ought not inconsiderately to interfere, even when the purpresture may also amount to a nuisance, provided the remedy by statute is sufficient to prevent or redress either the public or private injury.

10. But when, as in the case of the Statute of 1855, in relation to the fixing of a wharf line in the Christiana River, within the City of Wilmington, the remedy for encroachments on the stream beyond that line is difficult of enforcement and uncertain, a court of equity will afford whatever remedy it is authorized to afford, to a party injured or apprehending injury, without subjecting him to the inconvenience of seeking redress under the statute.

11. The mere doing a particular thing declared unlawful by the statute,— as, the driving of a pile or the building of a wharf beyond the wharf line established under the statute,—does not of itself constitute the pile or wharf such a public nuisance as will give any private citizen a right to maintain a bill for an injunction to restrain it.

12. If such act does not amount to a purpresture by making that several which is of right common, or does not amount to a material obstruction to navigation, equity will not interfere by injunction; and if it amounts to a purpresture merely; or to a public nuisance, by reason of being a material obstruction to navigation, common alike in its effects to all persons generally, the court will interfere only upon information or bill filed by the Attorney-General.

13. If, however, such act be a public nuisance by reason of being a material obstruction to navigation, by which a private person suffers or is threatened with substantial special damage, such person may maintain a bill for an injunction in his own name.

14. Equity will grant an injunction to restrain a public nuisance only

where the fact is clearly made out upon determinate and satisfactory evidence.

15. The words "river," "bank," "bed," "shore," defined.

16. The evidence, on a bill by a private party to enjoin the building, by a contiguous riparian owner, of a wharf beyond the established wharf line, in the Christiana River, examined, and found not to make out a case for equitable relief.

BILL TO ENJOIN THE ERECTION OF A WHARF.—The facts and questions presented are fully stated in the opinion.

*Geo. H. Bates* and *Austin Harrington,* for complainant:

I. The legislation establishing wharf lines in the City of Wilmington is the Act of February 6, 1855 (11 Del. Laws, p. 181); a supplementary Act passed January 14, 1859 (11 Del. Laws, 579); the Act of February 7, 1861 (12 Del. Laws, 31); the Act of February 12, 1867 (13 Del. Laws, 162); the Act of April 9, 1869 (13 Del. Laws, 463). There appears to be no city ordinance on this subject, and no other legislation than that above cited, affecting in any respect the south bank of the river where the wharf in question is proposed. The Act of 1772, sections 29 and 30 of which were repealed by the Act of 1855, will be found in 1 Del. Laws, 449. By that Act it was provided that wharf lines within the Borough of Wilmington should not be extended out so far as to leave a channel of less than 100 feet wide; and in the same Act the southern limit of the Borough of Wilmington was defined to be the channel of the Christiana Creek, so that the land in question is entirely unaffected by any of the provisions of that Act. There was an amendment to the city charter in 1809 (Digest of 1829, p. 676), which extended the limit of Wilmington southerly to the "opposite side of Christiana River," and § 11 gives the city council power "to provide for and regulate the wharves." If this power be held and extended to the fixing of the wharf lines, it was never acted on.

II. At common law, unchanged by statute in this State, the title to the shore of a navigable stream where the tide ebbs and flows between high and low water mark is in the

Sovereign; *i. e.*, in this country, in the State.    Hale, De Jure
Maris, chap. 4 (cited in 6 Cow. 514); *Carter* v. *Murcot*, 4
Burr. 2164, quoted in *People* v. *Platt*, 17 Johns. 211, with
the remark that "These privileges and distinctions have never
been denied or overruled."    The Crown owns between high
and low water mark in England.    Woolr. Waters, 78 Law
Lib. 448; *Gann* v. *Free Fisheries Co.* 11 H. L. Cas. 207;
*Scratton* v. *Brown*, 4 Barn. & C. 485.    This principle is
fully recognized in this country.    *Ex parte Jennings*, 6
Cow. 518.

The common-law principle, that as to the sea and arms
thereof the bed of the stream to high water mark belongs to
the public, applies to our fresh water rivers.    *Hooker* v. *Cum-
mings*, 20 Johns. 91; *Canal Comrs.* v. *People*, 5 Wend. 433.
It was settled, as the result of a long conflict, that the fresh
water rivers and lakes of the United States, where there is no
tide, are subject to the admiralty jurisdiction of the United
States Courts.    *The Genesee Chief* v. *Fitzhugh*, 53 U. S. 12
How. 233 (13 L. ed. 1058).    The effect is to put such streams
on the same footing here as the sea and its arms in England.
And, beyond question, all rivers connected with the sea, so
that the tide ebbs and flows therein, are to be treated as arms
of the sea.    *Hooker* v. *Cummings*, 20 Johns. 90; *Ingraham*
v. *Wilkinson*, 4 Pick. 274.    To such rivers the rules of the
common law applicable thereto, so far as the rights of the
State and riparian owners are concerned, are adopted, and in
such rivers the title to the bed of the stream is in the State,
and the titles of the riparian owners are restricted to high
water mark.    Houck, Riv. p. 12, H. pp. 300, 302; Wood,
Nuis. § 582; *Wiswall* v. *Hall*, 3 Paige, 318; *Weber* v. *State
Harbor Comrs.* 85 U. S. 18 Wall. 57 (21 L. ed. 798); *Canal
Comrs.* v. *People*, 5 Wend. 443.    The distinguishing feature
of public streams is "whether they are susceptible or not of
use for a common passage for the public."    *Palmer* v. *Mul-
ligan*, 3 Cai. 319; *People* v. *Platt*, 17 Johns. 211; Wood,
Nuis. § 580.    It is the rise and fall of the water, and not the
proportion of salt water to fresh, that determines whether a

particular portion of a stream is within tidewater.    *Attorney-General* v. *Woods,* 108 Mass. 36.

The result of the authorities is that in a navigable stream the State is absolutely the owner of the *alveus* of the stream to high water mark, and may control its use so long as it does not materially obstruct navigation.

III. The ownership of the bank does not give the riparian owner a usufructuary interest in the stream.    *Rex* v. *Smith,* 2 Doug. 441; 5 Com. Dig. *Navigation,* 102; *Somerset* v. *Fogwell,* 5 Barn. & C. 875; *Lewis* v. *Keeling,* 1 Jones, L. 306; *Lansing* v. *Smith,* 8 Cow. 146; *Stevens* v. *Paterson & N. R. Co.* 5 Vroom, 532; *Gould* v. *Hudson River R. Co.* 6 N. Y. 522; *Re Water Comrs.* 3 Edw. Ch. 306; *People* v. *Albany,* 11 Wend. 539; *Musser* v. *Hershey,* 42 Iowa, 356; *Tomlin* v. *Dubuque, B. & M. R. Co.* 32 Iowa, 109; *McManus* v. *Carmichael,* 3 Iowa, 1; *Mather* v. *Chapman,* 40 Conn. 382.

There are a few cases which seem to be against this doctrine, but they will not bear a careful and discriminating analysis. The most important of them is a supreme court case which ought to have due weight if it was founded on principle. It is a Wisconsin case, and the principal cases are in that State. They are all affected by the settled law of that State, that the riparian owner holds to the center of the stream. The statement in *Yates* v. *Milwaukee,* 77 U. S. 10 Wall. 497 (19 L. ed. 984), that the riparian owner has the right to free access to the navigable part of the stream is mere dictum.  See criticism on it in Wood, Nuis. p. 621, note.

IV. As a necessary consequence of the ownership of the State to high water mark, the Legislature has power to establish lines in a harbor beyond which no wharf shall be extended or maintained, and to declare any wharf extended or maintained beyond such lines a public nuisance; and such statutes, although they provide for no compensation to the riparian proprietors, are not unconstitutional as taking private property and appropriating it to public uses without compensation, nor as impairing the obligations of contracts.    *Com.* v.

*Alger*, 7 Cush. 53; 1 Dill. Mun. Corp. §§ 106, 107; *Bailey* v. *Philadelphia, W. & B. R. Co.* 4 Harrington, 389. The common law is in force in Delaware in full vigor. It did not rest here, as elsewhere, upon judicial recognition. It was embodied in the Constitution of 1776, art. 25. 1 Del. Laws, App. 89. The scope of this Constitutional adoption of the common law has been the subject of careful and discriminating examination and decision in this court. *Clawson* v. *Primrose*, 15 Am. L. Reg. N. S. 6. And a contemporaneous legislative declaration that the exercise of sovereignty by the State over this very subject matter was a part of the common law applicable to the Colony and the State is found in an Act regulating the wharf lines on the north bank of the Christiana Creek, passed in 1772, only four years prior to the adoption of the Constitution. 1 Del. Laws, 499. The shore being owned by the State between high and low water, no title can be given by any private grantor, and no prescription runs against the State. *Nullum tempus occurrit regi.* The statute (Rev. Code, p. 19, § 2) permitting titles by prescription to be acquired against the State, expressly excepts any " salt marsh, beach or shore." The term " shore " includes the space between the high and low water marks on navigable rivers. Houck, Riv. §§ 6, 7; Ang. Tidew. pp. 22, 23. The position that we have the common law here is strengthened by the fact that text writers,—Angell and others,—commenting upon the law, show the modifications of common law as in Massachusetts, Maine, etc., but are silent as to Delaware. Ang. Tidew. pp. 234, 236, 240. The whole contention against the validity of our legislation must rest upon certain cases in the United States Supreme Court. It will be instructive to examine here the entire course of decisions in that court on this subject. As early as 1845 the court settled the great fundamental doctrine of the sovereignty of the States over the whole subject, declaring in *Pollard* v. *Hagan*, 44 U. S. 3 How. 230 (11 L. ed. 574), that the " right of eminent domain over the shores and soils under the navigable waters, for all municipal purposes, belongs exclusively to the States within

their respective territorial jurisdiction ; and they, and they only, have the constitutional power to exercise it." In *Wilson* v. *Blackbird Creek Marsh Co.* 27 U. S. 2 Pet. 250 (7 L. ed. 414), the doctrine of state sovereignty was affirmed even to the extent of holding that, in the absence of legislation by Congress, the State Legislature could authorize the damming of a navigable stream, in derogation of the right of the riparian owner. The power of the State Legislature to authorize an obstruction to the navigation of a navigable stream, wholly within the limits of the State, came under review in two cases, in each of which the supreme court was divided and could give no opinion. In *Silliman* v. *Hudson River Bridge Co.* 66 U. S. 1 Black, 582 (17 L. ed. 81), the case went up on a certificate of division ; and the higher court being also divided, no decision was reached. In another case concerning the same bridge—69 U. S. 2 Wall. 403 (17 L. ed. 876)—the bill was dismissed below, and the decree affirmed by a divided court. The same result was reached in the case of *The Passaic Bridges,* 3 Wall. App. 783.

Thus the question stood until it was settled by a majority decision in the supreme court in *Gilman* v. *Philadelphia,* 70 U. S. 3 Wall. 713 (18 L. ed. 96). Here the court reaffirmed the doctrine of the *Blackbird Creek Case* and upheld the right of the State, in the exercise of its sovereignty, to authorize the building of a bridge which was an obstruction of a navigable stream and in derogation of the supposed right of riparian proprietors in the stream. The doctrine of *Gilman* v. *Philadelphia* was approved by the court in *Crandall* v. *Nevada,* 73 U. S. 6 Wall. 42 (18 L. ed. 746), and the *Blackbird Creek Case* was strongly reaffirmed in *Pound* v. *Turck,* 95 U. S. 459 (24 L. ed. 525). Thus the federal tribunal of last resort has bowed before the sovereignty of the State in this one matter, at least, and, commencing at Delaware, has upheld the authority of the Legislature over the navigable waters of the State, even where it had given legal sanction to an obstruction to navigation. *Dutton* v. *Strong,* 66 U. S. 1 Black, 23 (17 L. ed. 29), was an action of

trespass against the owners of a pier at Racine, extending into Lake Michigan, by the owners of a vessel which in a storm they had made fast to the pier, and which had been cut loose by the owners of the pier to save the pier from damage.  This case, upon examination, will be found to differ so materially from the present one as to have little if any application to it.  It holds that a pier erected in the navigable waters of Lake Michigan was not *ipso facto* a nuisance, if not specially authorized by the Legislature.  The court rests its decision on the ground that " no positive law or regulation was violated in its erection."  Here the case differs widely from this one, in which the erection is against the positive law of the State. It will be noted that the court only justified such erections " where they conform to the regulations of the State."  Again ; the decision is put strongly on the facts in that case, it not being " even suggested . . . that the pier, as constructed, constituted any right whatever to the public right of navigation."  In the present case we hold that the regulations of the State were not conformed to, but violated, and that the proposed pier is in fact an obstruction to navigation.

*Yates* v. *Milwaukee*, 77 U. S. 10 Wall. 497 (19 L. ed. 984), is much relied upon, doubtless, to sustain the defendant here.  Upon careful examination, however, it will be found to fall far short of doing so.

The case of *Weber* v. *State Harbor Comrs.* 85 U. S. 18 Wall. 57 (21 L. ed. 798), contains an approving reference to *Yates* v. *Milwaukee*, and refers to it specifically as deciding that the riparian owner has a right to build out wharves subject to the regulation of the legislative power of the States. This case of *Weber* v. *State Harbor Comrs.* will be found to sustain the views we maintain.

All that is said in *Atlee* v. *Northwestern Union Packet Co.* 88 U. S. 21 Wall. 389 (22 L. ed. 619), about the power to erect wharves, affirms the doctrine of the absolute power of the Legislature to regulate and control the subject.

V. The remedy proper to be applied in the case is an injunction by this court to restrain the erection of the wharf

as proposed.   Courts of equity have jurisdiction to restrain the creation of a nuisance as well as to abate a nuisance already erected.   Houck, Riv. p. 305 ; *People* v. *Harris*, 10 Ill. 367, 374; *Musser* v. *Hershey*, 42 Iowa, 365 ; Wood, Nuis. § 788; 2 Story, Eq. Jur. § 924; *Cleveland* v. *Citizens Gas Light Co.* 5 C. E. Green, 201.   Many illustrations may be given of the exercise of this power : (1) as to private nuisances, as in the case of the erection of a building which would cut off an ancient light, which has been restrained by this court (*Clawson* v. *Primrose*, 15 Am. L. Reg. N. S. 6) ; (2) as to public nuisances affecting private persons, at suit of the latter, as one affected by the obstruction of a street on which he owns lots (*Corning* v. *Lowerre*, 6 Johns. Ch. 439) ; (3) as to public nuisances affecting the interests of the people at large of a municipality, at suit of the Attorney-General (*Com.* v. *Rush*, 14 Pa. 186).

The jurisdiction of equity in cases of nuisance is long settled (1 Spence, Eq. Jur. 672), and is a jurisdiction independent of and concurrent with an action at law (Cary, 28). The jurisdiction of equity over the whole subject is concurrent with that of courts of law, and more effective.   Wood, Nuis. § 833 ; High, Inj. § 761 ; 1 Story, Eq. Jur. § 33 ; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162.   Equity will restrain a public nuisance upon application of one who suffers personal injury, though there be a remedy at law.   *Rochester* v. *Curtiss*, Clarke, Ch. 339.   The existence or nonexistence of a remedy at law is no test as to the right to relief in equity. The remedy at law must be plain and adequate ; in other words, it must be as practical and efficient to secure the ends of justice and its proper and prompt administration, as is the remedy in equity.   High, Inj. § 30.   The real test by which to determine whether an injunction should be granted or not is whether, under all the circumstances of the case, the plaintiff ought to be required to submit to the injury complained of.   Wood, Nuis. p. 861, §§ 781, 814; *Goodson* v. *Richardson*, L. R. 9 Ch. App. Cas. 221 ; *Webb* v. *Portland Mfg. Co.* 3 Sumn. 189 ; *Frink* v. *Lawrence*, 20 Conn. 117.   See

also *Reid* v. *Gifford*, Hopk. Ch. 416 ; *Lyon* v. *McLaugh-lin*, 32 Vt. 423.    The irreparable injury against which equity will protect is not that which cannot be redressed at law, but that for which no reasonable redress can be had there.    Wood, Nuis. § 770.    The Supreme Court of the United States has sustained the jurisdiction of the courts of equity, both to enjoin and to abate an obstruction to navigation, in the *Clinton Bridge Case*, 77 U. S. 10 Wall. 454 (19 L. ed. 969), and *Pennsylvania* v. *Wheeling & B. Bridge Co.* 54 U. S. 13 How. 518 (14 L. ed. 249).

VI. In cases of public nuisances only, the proper course is to file an information at the suit of the Attorney-General. But when a case of nuisance is made producing private injury with special damage to the complainant, although it may also produce public injury, a bill for injunction may be filed by the party suffering the private injury, and the Attorney-General need not be made a party.    See *Mississippi & M. R. Co.* v. *Ward*, 67 U. S. 2 Black, 486 (17 L. ed. 311) ; Drew. Inj. 240 ; 2 Bl. 220, note ; Waterman's Eden, Inj. 267 ; 2 Story, Eq. Jur. § 924 ; Wood, Nuis. § 811 ; Ang. Tidew. 201 ; *Sampson* v. *Smith*, 8 Sim. 272 ; *Spencer* v. *London & B. R. Co.* Id. 193 ; *Wetmore* v. *Story*, 22 Barb. 443 ; *Milhau* v. *Sharp*, 27 N. Y. 625 ; *Lansing* v. *Smith*, 4 Wend. 9 ; *Soltau* v. *De Held*, 9 Eng. L. & Eq. 104 ; *Davis* v. *New York*, 14 N. Y. 526 ; *Atty-Gen.* v. *Johnson*, 2 Wils. Ch. 87 ; *Hamilton* v. *Whitridge*, 11 Md. 128 ; *Clowes* v. *Staffordshire P. Water Works Co.* L. R. 8 Ch. App. Cas. 125 ; *Fink* v. *Lawrence*, 20 Conn. 121 ; *Garitee* v. *Baltimore*, 53 Md. 422 ; *Gillespie* v. *Forrest*, 18 Hun, 110 ; *Atty-Gen.* v. *Lonsdale*, L. R. 7 Eq. Cas. 377.

VII. Such, then, being the well-ascertained jurisdiction of the court, we proceed to consider the character of the proposed erection which, upon the law applied to the case and the facts proved, must be condemned as a nuisance upon three distinct grounds : 1. Any intrusion into a navigable stream, unauthorized by the law of the State, is a nuisance *per se.    People* v. *Vanderbilt*, 38 Barb. 283 ; *Hudson River*

*R. Co.* v. *Loeb,* 7 Robt. 418; *Wetmore* v. *Atlantic White Lead Co.* 37 Barb. 70; *Garitee* v. *Baltimore,* 53 · Md. 422; *New York* v. *Baumberger,* 7 Robt. 219; *Columbus* v. *Jaques,* 30 Ga. 506; *Atty-Gen.* v. *Terry,* L. R. 9 Ch. App. Cas. 423; *Potter* v. *Menasha,* 30 Wis. 492; *Musser* v. *Hershey,* 42 Iowa, 356. It is upon the same principle that an unauthorized obstruction of a public highway or street is a nuisance. *Davis* v. *New York,* 14 N. Y. 506; *People* v. *Third Ave. R. R. Co.* 45 Barb. 63. 2. Under the Act of 1859 any construction beyond the wharf line is *ipso facto* a nuisance. It has been already established that the State is absolute owner of the bed of the stream between high and low water mark; its ownership is not like the ownership of lands of a private individual, but amounts to the right to regulate property which is dedicated to the public use. The only way in which the State can assert its ownership is by a regulation of the public use of this portion of the stream as a place for building wharves to facilitate its citizens in availing themselves of the stream as a great public highway. The nature of this power is well defined in *People* v. *Vanderbilt,* 38 Barb. 286; Ang. Tidew. p. 202; Wood, Nuis. p. 625, note 3; *The Passaic Bridges,* 3 Wall. App. 783. The distinction between the civil law and the common law is very clear. By the former anyone might project a mole into the sea, provided no one is injured thereby. By the latter, the King (or the State) may abate every intrusion thereof, whether the same be an obstruction or not. Ang. Tidew. 198. If a wharf between high and low water mark occasions any hindrance to the navigation of the river by vessels of any description, it would be no defense that it was a benefit to navigation in general. *Wheeling Bridge Case,* 54 U. S. 13 How. 518 (14 L. ed. 249); Ang. Tidew. 202; *Rex* v. *Russell,* 6 Barn. & C. 566; *Reg.* v. *Randall,* 1 Car. & M. 496; *Respublica* v. *Caldwell,* 1 U. S. 1 Dall. 150 (1 L. ed. 77); *People* v. *Vanderbilt,* 38 Barb. 287; *Rex v. Grosvenor,* 2 Stark. 511. The ebb of the tide, when from natural causes it ebbs lowest, and not the average or common ebb, is to be taken as the low water

mark. *Sparhawk* v. *Bullard*, 1 Met. 95.   3. The testimony
shows that this particular wharf, if made, would be in fact
an obstruction to navigation and therefore a nuisance.

*Benjamin Nields*, for the defendant :

I. The wharf line on defendant's lot, as fixed and deter-
mined by the commissioners, as appears by their return, does
not extend into nor along the margin of the stream, but on
the contrary is about 188 feet from the margin of the stream,
and 39 feet inside of the Holland's Creek marsh bank, and is
not in any sense a wharf line, for the reason that any build-
ing or structure erected there would not be a wharf.   It is
very clear that the duty of the commissioners, as defined in
the Act, related to the waters of the Christiana Creek ; that
they were to fix and determine the limit to which wharves,
etc., might be built into the water or along the margin of the
stream,—the water.   Their duties did not relate to the dry
land on either side of the stream, beyond the margin of the
water line ; that they should fix wharf lines 200 feet away
from the margin of the stream or any distance whatever away
from the margin of the water, or to fix the line in the stream
where the same was not navigable and could not be made so,
was never intended by the Act, is wholly unauthorized and
void.   See *Yates* v. *Milwaukee*, 77 U. S. 10 Wall. 497 (19
L. ed. 984); *Dutton* v. *Strong*, 66 U. S. 1 Black, 25 (17 L.
ed. 29); *St. Paul & P. R. Co.* v. *Schurmeier*, 74 U. S. 7
Wall. 282 (19 L. ed. 74) ; *Webber* v. *State Harbor Comrs.* 85
U. S. 18 Wall. 57 (21 L. ed. 798); *Atlee* v. *Northwestern
Union Packet Co.* 88 U. S. 21 Wall. 389 (22 L. ed. 619) ; 1
Dill. Mun. Corp. p. 135, § 106 ; 13 Wend. 289 ; 4 Wend. 9 ;
*Thornton* v. *Grant*, 10 R. I. 477.   By the authorities above
cited, it is very clear that a riparian proprietor whose land is
bounded by a navigable stream has the right of access to the
navigable part thereof from the front of his lot, and the right
to erect a wharf for his own use or for the use of the public,
subject to such general rules and regulations as the Legislature

may see proper to impose for the protection of the public, whatever they may be; and it is also very clear that, while the Legislature may have the right to establish rules regulating the access of the owner to the navigable part of the stream, it has not the power to destroy or take away from the owner his right of access, without compensation.  It is not necessary that property should be absolutely taken,—in the narrowest sense of that word,—to bring the case within the protection of those provisions of the Constitution of the United States, and of the several States, which declare that private property shall not be taken for public use without just compensation. Such serious interruption to the common and necessary use of property as is equivalent to a taking will bring the case within the meaning of the Constitution.  *Pumpelly* v. *Green Bay & M. Canal Co.* 80 U. S. 13 Wall. 166 (20 L. ed. 557); Ang. Watercourses, § 465 ; *Hooker* v. *New Haven & N. H. Co.* 14 Conn. 146 ; 21 Pick. 344 ; 14 Wend. 604.

II.  The State having parted with its title to the *locus in quo*, and having no right to or in the same, excepting the right of eminent domain, and the defendant being the owner thereof in fee to the line of ordinary low water mark, the erection of a wharf thereon by defendant would not be a purpresture, and not being a purpresture or an encroachment on any right of the State, it cannot therefore be held to be a nuisance.

By the grants to the proprietors of Pennsylvania and New Jersey, they held only to the River Delaware, respectively, and could not claim any part of the bay or river below low water mark, the right to the entire bed of which remained in the Crown.  *Bennett* v. *Boggs*, Bald. 72, 73.  The grants of William Penn, proprietor of Pennsylvania and also of Delaware, gave to his grantees, of lands bordering on the Delaware River and other navigable streams, title to low water mark. After the Revolution the right which the Crown had was vested in the State ; that is, in the bed of the stream below the lines of low water mark.  The limit of the State of Delaware on the eastern side of the River Delaware is at low water mark within the twelve mile circle from New Castle.  After

the Revolution, therefore, the State of Delaware took, in the bed of navigable streams, only so much as was vested in the Crown prior to the Revolution. The courts in Pennsylvania have uniformly held that the grants under Penn were to low water mark. *Klingensmith* v. *Grumd*, 5 Watts, 458. See also *Naglee* v. *Ingersoll*, 7 Pa. 185–201 ; *Lehigh Valley R. Co.* v. *Prone*, 28 Pa. 206 ; *Simpson* v. *Neill*, 89 Pa. 186 ; *Ball* v. *Slack*, 2 Whart. 508 ; *Cooper* v. *Smith*, 9 Serg. & R. 32. The grant of William Penn to John Paul Jaquett, in 1864, of the land situated on the south side of the Christiana Creek, and of which defendant's lot now forms a part, vested in him all the right that Penn had therein ; and under the uniform decisions of the courts of Pennsylvania such grants have been held to convey title to low water mark. Therefore the erection by the defendant of his proposed wharf could not be a purpresture.

But if the right to the *locus in quo* is in the State, the erection of a wharf thereon by defendant would not be *per se* a nuisance. *Rex* v. *Russell*, 6 Barn. & C. 566; *Lyon* v. *Fishmongers Co.* L. R. 1 App. Cas. 662. A thing may be a purpresture, and not a nuisance. Houck, Riv. 201, 292, 301–303, 305. To warrant an injunction against an alleged purpresture, it must clearly appear that it is such in fact; and if it be doubtful whether there is a purpresture, the relief will be denied. *Attorney-General* v. *Delaware & B. B. R. Co.* 12 C. E. Green, 1 ; *Attorney-General* v. *Cohoes. Co.* 6 Paige, 133 : *Mohawk Bridge Co.* v. *Utica & S. R. Co.* Id. 554 ; 1 High, Inj. §§ 759–762 ; *Attorney-General* v. *Cleaver*, 18 Ves. Jr. 217 ; *Hamilton* v. *New York & H. R. Co.* 9 Paige, 171 ; *Morris & E. R. Co.* v. *Prudden*, 5 C. E. Green, 530 ; *People* v. *Davidson*, 30 Cal. 379.

III. A private person seeking the aid of equity to restrain a public nuisance must show some special injury, peculiar to himself, aside from and independent of the injury to the public. Even in case of unquestioned nuisance, if the party complaining shows no special injury to himself different from the common injury to the public, he is not entitled to an

injunction.   *Bigelow* v. *Hartford Bridge Co.* 14 Conn. 565; *Spencer* v. *London & B. R. Co.* 8 Sim. 193 ; *Engs* v. *Peckham*, 11 R. I. 210.   A wharf may be built into a navigable stream, and not be a nuisance.

IV.  Finally, under the evidence in the case, the defendant's wharf, if built as proposed, would not be an obstruction to navigation ; and its erection would not be a trespass upon any of the rights of the complainant,—such an injury as it could recover damages for.

THE CHANCELLOR.—In 1855 the Legislature of the State of Delaware passed an Act to regulate the building of wharves in the City of Wilmington.

Five commissioners were appointed by the Act " to view the River Christiana, where the same fronts the City of Wilmington, and thereupon to adjust and determine a certain limit on each side of the River Christiana to which wharves may be hereafter extended out into the said river ; such limits to be ascertained by certain fixed distances, to be computed and measured from such landmarks as the said commissioners may for that purpose adopt."

The said limits were to extend from a point at which the southwesterly boundary of the city crosses the River Christiana, to the junction of the said river with the Brandywine Creek.

The commissioners were required to make a return of their proceedings in the premises, with a plot of the said River Christiana, showing distinctly the said limits, with such distances and landmarks as might be adopted for ascertaining the same.   The return and plot were required to be filed and preserved in the office of the city council.

Section 2 of the Act was as follows : " From and after the filing of the return of the above-named commissioners in the office of the city council, it shall not be lawful, for any purpose whatsoever, to construct, or cause to be constructed, on either side of the River Christiana, between the point where the southwesterly boundary of the said city crosses the river

and its junction with Brandywine Creek, any wharf, platform, landing-place, marine railway, pier, piles, abutment, or other obstruction to the current of the said river, extending into the river beyond the limits adjusted and determined in and by the said return."

Section 4 of the Act provides a penalty for the building of wharves, platforms, landing-places, marine railways, piers, piles, abutments, or other obstructions of the said River Christiana, contrary to the provisions of the Act.

The City Council of Wilmington were empowered to adjudge whether the Act had been violated. A penalty of $500, to be recovered with costs of suit as debts of like amount are by law recoverable,—one half of said penalty to be for the use of the person suing therefor, and the residue thereof to be for the use of the City of Wilmington,—was imposed, by the Act, upon anyone violating its provisions in respect to the matters prohibited.

And it was made the duty of the Mayor of Wilmington, "If any such wharf, platform, landing-place, marine railway, pier, piles, abutment, or other obstructions be not removed or conformed to the provisions of this Act within ninety days after the delivery of such certified copy as aforesaid, without delay, to issue a warrant under his hand and seal of office, directed to the city commissioner, commanding him to abate such wharf, platform, landing-place, marine railway, pier, pile, abutment, or other obstructions, or to conform the same to the provisions of this Act." And it was made the duty of the city commissioner to proceed forthwith to abate the same, or to conform the same to the provisions of said Act.

When complaint had been made by one or more inhabitants of said city that any wharf, platform, landing-place, marine railway, pier, pile, abutment, or other obstruction of the said River Christiana had been constructed, and when the city council had adjudged that the matter or thing complained of was held or kept contrary to the provisions of this Act, it was made the duty of the clerk of the city council to deliver to the owner or occupier of any such wharf, platform, landing-

place, marine railway, pier, pile, abutment or other obstruction a certified copy of the judgment of the city council respecting the same.

The forfeit of $500 by any such owner was not incurred, nor was any such obstruction subject to be abated, unless the obstruction was not removed or conformed to the provisions of the Act within ninety days after delivery of such certified copy to the person or persons, or corporation, holding the same as the owner or owners thereof.

There were several supplements to this Act afterwards passed, none of which, however, materially affects the question involved in this case, as all the provisions of the Act of 1855 not inconsistent therewith are extended and made a part of the supplement of 1869, under which the return and plot in evidence was made.

The complainant corporation is the owner of certain wharves and ways used for the building and repairing of vessels situated on the northern boundary of the Christiana River, in the City of Wilmington, and also of a lot or piece of ground adjoining a lot or piece of ground of the defendant, on the opposite side of said river. It complains that the defendant has threatened and is about to erect a wharf on his, the defendant's, lot, and within the wharf line established by said commissioners, on that side of the river; and that the building and extending the said wharf by the defendant into the said river as threatened will obstruct its navigation and also cause the mud to be deposited upon its, the complainant's, lot; and that the erection of said wharf will be a public nuisance from which it, the complainant, will suffer also special damage, not only by reason of the deposit of the said mud as aforesaid, but for the further reason that, the navigation of the said river being so obstructed, persons will not bring their vessels to its, the complainant's, wharves to be repaired, etc.

The solicitors for the complainant insist, in argument, that the said Act of Assembly to regulate the building of wharves in the City of Wilmington, and the several supplements thereto, are constitutional and a proper exercise of the power

to regulate the building of wharves upon a navigable river, and the establishment of a wharf line beyond which wharves shall not be built into or along said river is a due exercise of legislative authority ; and. that the building of wharves contrary to said Act being declared by said Act of Assembly unlawful, the wharf of the defendant, if built, will be a nuisance *per se*, and should be abated if built, and be restrained if threatened.    The defendant contends that the commissioners appointed by the Act have never properly executed their commission, but, on the contrary. have fixed the wharf line so as to prevent the riparian owners, and himself in particular, from having access by means of wharves to the navigable parts of the river ; and that if the Act of Assembly is construed to authorize the action of the commissioners, the Act itself must be held to be unconstitutional, because the defendant being a riparian owner, and as such entitled to the land, and to build a wharf to the low water mark, and to the use of the river for that purpose to the point of navigability ; and these rights of his being property,—he cannot be deprived of them without just compensation.

I will here remark that the case must be clear,—at least be free from reasonable doubt,—and the question necessary to the determination of the case, before this court should assume the function of declaring an Act of the Legislature unconstitutional.    I do not find it necessary so to declare in the present case.    The lawmaking power of the State is the rightful authority to provide for the preservation and maintenance of the Christiana River as a public navigable stream, free and unobstructed, for all the citizens of the State, and if necessary it has authority to enact that even a riparian owner thereon shall not so use his own property-rights as to destroy or obstruct the free navigation of the river.

This would not be taking private property for public use in any just sense of these words.    The private property of the riparian owner would not be taken at all ; its use only would be regulated, and regulated only so far as to prevent that use in a particular mode from working general public

mischief from the creation of a public nuisance by a material obstruction to the existing free navigation of the river.

The proof shows that the defendant is a riparian owner on the Christiana River.  As such he has all the rights of a riparian owner.  But riparian rights are always subject to the state regulation.  What these rights are was ably and at great length discussed in the argument of the case by the respective solicitors.  Whatever the common law of England might have been, or is now, whatever the law of other States may be, on this subject, I feel bound to recognize as true (at least until the law shall be declared by the court of errors and appeals to be otherwise) the law decided by our own law courts, that a riparian proprietor or owner of land fronting upon a navigable river holds to the low water mark.  See the case of *Bickle* v. *Polk*, 5 Harrington, 325, and the case of *State* v. *Reybold*, Id. 484,—neither of which was referred to in the argument.

The jurisdiction of equity over the subject of public nuisances has been so fully discussed and clearly defined, not only by the writers of text books, but by adjudged cases, that I consider it too well settled to need any discussion here.  I shall therefore confine myself to stating a few propositions applicable to the present case, which need no elaboration.

To redress the wrong of a mere purpresture or of a public nuisance, an information in the name of the Attorney-General is the proper remedy in a court of equity.

A court of equity will not only interfere upon the information of the Attorney-General, but also upon the application of private parties directly affected by the nuisance, where the injury is irreparable, or there is no adequate remedy at law. But in all cases of this sort,—that is, upon the application of private parties,—courts of equity will grant an injunction to restrain a public nuisance only in cases where the fact is clearly made out upon determinate and satisfactory evidence; for if the evidence be conflicting and the injury to the public doubtful, or if the private injury be such that there is an adequate remedy at law, these will constitute grounds for withholding the extraordinary interposition.

Obstructions in navigable rivers made in aid of commerce, which do not materially injure the navigation, are not nuisances. The court cannot pronounce a simple obstruction in a navigable river a nuisance; it is a fact to be found.

Trade and commerce are the chief objects, and the right of passage is subservient to them. A structure which promotes the convenience of the public cannot be a nuisance to it.

The obstruction must be a material one. It is not every encroachment upon the navigable waters of a stream that is *per se* illegal, or a nuisance. The exception is in a case of purpresture; and in the case of a mere purpresture the court will not enjoin or abate it, unless it shall appear as a fact, ascertained by the verdict of a jury, to the injury in England of the King, or in this country to the injury of the public.

The law applicable to this case seems to have been properly adjudged in the case of *Delaware Canal Company* v. *Lawrence*, 2 Hun, 163. In that case, among other things, the court remarked: "Free navigation, properly understood, does not mean the right of every person to sail every portion of a navigable stream to high water mark nor even to low water mark;" and Lord Hale says: "It is not every building below the high water mark nor every building below the low water mark that is *ipso facto* in law a nuisance."

Wharves and docks are necessary in aid of commerce and navigation, and without them neither could be conducted.

Wharves are frequently constructed by the riparian proprietor on the shores of navigable rivers; and when they do not extend below low water mark are not necessarily public nuisances in fact, and will not be interfered with by courts of equity unless it be ascertained that the rights of the public are thereby injured.

Justice Catron, in the case of *Mississippi & M. R. Co.* v. *Ward*, 67 U. S. 2 Black, 494, 495 (17 L. ed. 315), lays down the rule as to obstructions as follows: "That if the abridgment of the right of passage occasioned by the erection was for a public purpose, and produced a public benefit; and if the erection was in a reasonable situation, and a rea-

sonable space was left for the passage of vessels,—then it is not an unreasonable obstruction."

A purpresture is not a term that applies to a wharf built upon the shore of a navigable stream by the proprietor of the soil, but only so when carried so far into the channel, or so far beyond his title, as to become a nuisance.

In *Dutton* v. *Strong,* 66 U. S. 1 Black, 32, 33 (17 L. ed. 32), Judge Clifford says, expressing the opinion of the court: "Whenever the water of the shore, so to speak, is too shoal to be navigable, there is the same necessity for such erections as in the bays and arms of the sea. And when that necessity exists, it is difficult to see any reason for denying to the adjacent owner the right to supply it; but the right must be understood as terminating at the point of navigability, where the necessity for such erections ordinarily ceases."

Piers or landing-places, and even wharves, may be private, or they may be in their nature public, although the property may be in an individual owner, and a riparian proprietor may construct one of these improvements for his own exclusive use and benefit, within the shore of the sea or navigable water. The obstruction to navigation must be plainly a nuisance before it can be removed by decree.

By free navigation must not be understood a navigation free from such partial obstacles and impediments as the best interests of society may render necessary; and free navigation does not exclude the construction of wharves for commercial objects limited by the rule laid down, viz.: if constructed within the limits of low water mark upon the proprietor's soil, and not so materially obstructing navigation as to become a nuisance.

Whether it is a public nuisance or not depends upon whether it is, or is not, injurious to the public.

Where an act complained of, or which is apprehended, besides being a public nuisance is specially injurious to a private person, he may maintain an action or a bill for injunction in his own name.

If this were a case represented as a mere public nuisance,

this court could not interfere, as the Attorney-General is not a party; and if he were a party in a case, it ought not to interfere—generally speaking—by injunction, until the question as to whether the subject matter was or was not a public nuisance had been tried at law.

The bill in the present case, however, proceeds upon the assumption that the proposed wharf will, if erected, be a public nuisance, attended with extreme probability of irreparable injury to the property and business of the complainant.

If such a state of facts should be clearly established by proof, the case would be brought within the proper cognizance of this court, and an injunction might be properly granted.

In the case of *People* v. *Davidson*, 30 Cal. 379, it was decided that "It does not follow as a legal conclusion that a wharf erected below high water mark in tidewaters, and upon the soil thereunder belonging to the State, is a public nuisance or an injury to commerce and navigation"—that is, "whether such wharf is a public nuisance is a question of fact;" and that when the court is satisfied that a wharf erected in tidewaters, and upon the soil thereunder belonging to the State, is not a public nuisance, an injunction should be refused, or dissolved if one has been temporarily granted. In that case it was denied that courts of equity have any power to decree the destruction of, or to enjoin a purpresture caused by the erection of, a wharf in tidewaters upon the soil thereunder, belonging to the State, without a license from the State, unless it is or will be a public nuisance, or is or will be followed by some form of irreparable damage; or unless it will be a hindrance to the execution of some legislative Act relating to fishing, or to commerce or navigation.

In the case of *Yates* v. *Milwaukee*, 77 U. S. 10 Wall. 497 (19 L. ed. 984), the court held that the owner of land bounded by a navigable river has certain riparian rights whether his title extends to the middle of the stream or not; that among these are free access to the navigable part of the stream and the right to make a landing, wharf, or pier for his own use

or for the use of the public; that these rights are valuable and are property, and can be taken for the public good only when due compensation is made; that while they are to be enjoyed subject to such general rules and laws as the Legislature may prescribe for the protection of the public in the river as a navigable stream, a statute of a State which confers on a city the power to establish dock and wharf lines, and to restrain encroachments and prevent obstructions to such a stream, does not authorize it to declare by a special ordinance a private wharf to be an obstruction to navigation, and a nuisance, and to order its removal, when in point of fact it was no obstruction or hindrance to navigation.

This decision, however, should be limited to the very subject matter which was intended to be decided; namely, the authority of a municipality to declare by special ordinance a private wharf to be an obstruction and a nuisance, and to order its removal, when in point of fact it is no obstruction or hindrance to navigation.   To this extent it commends itself to the legal mind, and cannot, I think, reasonably be questioned.

It is not reasonable that, owing to the limited width of the Christiana River, any one commercial commodity or lawful business enterprise should be crowded out to give exclusive privilege or place to another, or that any one legitimate business should be prohibited for the advantage of another; nor is it any reason that, because of its limited capacity, wharves for commercial advantages should be excluded, enjoined, or forbidden to aid in whatever right of commerce it may accommodate.

Courts cannot exclude one commodity to favor another; they cannot enjoin small commercial enterprises to give places to larger ones; nor can they exclude any citizen from exercising the common right of navigation thereon, or restrain him in the exercise of any right in respect thereto which is not prejudicial to its free navigation.

The courts, when their interposition is sought to determine these conflicting rights, must, in the just and faithful

exercise of judicial duty, declare that every branch and commodity of commerce, whether extended or limited in degree, and every aid and facility intended for its advancement, are entitled to equal protection, and an equal status in the right of enjoyment of free navigation and in furnishing the facilities and aids thereto.

Thus far I have scarcely used any language, and certainly have not announced any principle, not to be found in adjudged cases.

In the case of a purpresture which is made unlawful by statute, and for which a specific remedy is supplied by statute, courts of equity ought not inconsiderately to interfere, even when the purpresture may also amount to a nuisance; provided the remedy by statute is sufficient to prevent or redress either the public or private injury. In such case the Legislature, representing the State, has provided a legal remedy which, if it be not exclusive, should be regarded by courts of equity as the better mode of redressing the public injury to the State and public, and as a proper mode to redress any individual injury.

The Act creating a commission to establish a wharf line upon the Christiana River, within the City of Wilmington, has entrusted the municipal authority of that city with the power of adjudging whether the Act has been violated, and of abating any prohibited obstruction in that river; and has also provided a penalty to be recovered from the person guilty of this violation for the use and in the manner therein prescribed.

This, then, is a case of municipal authority conferred by the Legislature upon the City of Wilmington; and, when such authority is conferred upon a municipality, courts of equity should be very cautious in assuming to exercise jurisdiction over such matters, even though their right to do so has previously existed, and has not been taken away by the Legislature.

In the case before me, however, the power to establish wharf lines was not conferred upon the municipality of the

City of Wilmington, but upon persons unconnected therewith; and the authority to judge in respect to the violations of the Act by the erection or creations of obstructions to the navigation of the river beyond the wharf line, and to abate the obstructions, if any, and to enforce the forfeitures incurred by such violations, is by the Act attempted to be conferred upon the municipality. The Act in this respect seems to be defective, and the remedy provided by the Act to be difficult of enforcement; and wherever this is the case a court of equity will afford whatever remedy it is authorized to afford, without subjecting a party injured or apprehending injury to the inconvenience of seeking redress by means of the uncertain and doubtful remedy provided or attempted to be provided by the statute. I am, therefore, brought to the consideration of the question whether it has been proved in this case that the erection of the wharf threatened by the defendant will be a public nuisance by reason of materially obstructing the navigation of the Christiana River, and whether it has been proved that if such wharf would be a public nuisance the complainant would suffer such a special injury or damage as would warrant the interposition of this court by exercising its restraining power in respect thereto. I cannot admit it to be true that the mere fact of the doing a particular thing,—as the driving of a pile or the building of a wharf beyond the wharf line laid down by the commissioners,—being declared unlawful, will from that fact simply constitute the pile or wharf such a public nuisance as will give any private citizen a right to maintain a bill in this court for an injunction to restrain it. If it does not amount to a purpresture by making that several which is of right common, or does not amount to a material obstruction of navigation, this court will not interfere by injunction. If a purpresture merely, this court will interfere only upon information or bill filed by the Attorney-General.

So, also, where it is a public nuisance by reason of being a material obstruction to the navigation, common alike in its consequences or effects to all persons generally.

But if it be a public nuisance by reason of being a material obstruction to navigation by which a private person suffers, or is threatened with substantial special damage, such person may maintain a bill for an injunction in his own name.

Will the wharf, 13 feet above low water mark, proposed to be built by the defendant, be a material obstruction to the navigation of the Christiana River and thereby be a public nuisance? And, if so, will the complainant thereby suffer such special damage as will justify the exercise of the restraining power of this court in its behalf?

These are questions of fact, and must be proved as other facts are proved.

The proof in respect to these alleged facts is before me, and consists of the sworn testimony of witnesses, taken by the examiner.

It appears, from the testimony, that the wharf line established by the commissioners appointed under the supplement to the original Act, passed April 9, 1869, and which authorized the commissioners to readjust, alter, fix and determine the limits and distances to which wharves may be extended out into or along the margin of said stream, is about 39 feet inside of the Holland marsh bank (an artificial bank existing prior to 1773, and authorized in that year to be repaired), upon what may therefore be called the fast land of the defendant, and about 176 feet from low water mark on the side of the river next to the defendant's lot. If the defendant's proposed wharf is built, the distance from its bulkhead to the bulkhead of the complainant's wharf across the river will be about 245 feet. The proposed wharf of the defendant being 13 feet above low water mark, and the channel extending all the way across to the opposite side of the river and to the bulkhead of the complainant's wharf, there will be a space free for navigation of about 245 feet, as before stated, 100 or 120 feet of which, as differently located by the witnesses, will be 12 feet deep. Now, whether the building of the proposed wharf by the defendant will be a material obstruction to the navigation of the river, and therefore a nui-

sance, is a question of fact, in respect to which the testimony of the witnesses or the proof is conflicting.   George B. Lobdell, George W. Bush, George Moore, Henry Mendenhall and John Taylor Gause believe the proposed wharf would be an obstruction.   Charles W. Talley, Charles E. Sparks, Enoch Moore, Jr., Jacob Pusey, Charles M. Bird, William G. Gibbons, Charles Green and Ephraim T. Walton believe it would not be an obstruction.

Before I proceed to analyze the evidence of the witnesses upon the question as to whether the construction of the wharf as contemplated by the defendant will be a public nuisance, I will briefly consider the principles which govern the courts of equity in granting or refusing injunctions in cases of alleged public nuisances.   The rule is thus stated by Mr. Story (Eq. Jur. § 924, *a*): "But in all cases of this sort courts of equity will grant an injunction to restrain a public nuisance only in cases where the fact is clearly made out upon determinate and satisfactory evidence.   For if the evidence be conflicting, and the injury to the public doubtful, that alone will constitute a ground for withholding this extraordinary interposition."

In a case, 3 Mylne & K. 179, Lord Brougham said: "In considering more generally the question which is raised by the present motion, I certainly think we shall not go beyond what both principle and authority justify, if we lay down the rule respecting the relief by injunction, as applied to such cases, to be this: If the thing sought to be prohibited is in itself a nuisance, the court will interfere to stay irreparable mischief without waiting for the result of a trial; and will, according to the circumstances, direct an issue or allow an action, and, if need be, expedite the proceedings, the injunction being in the mean time continued.   But where the thing sought to be restrained is not unavoidably and in itself noxious, but only something which may, according to circumstances, prove so, the court will refuse to interfere until the matter has been tried at law, generally by an action, though in particular cases an issue may be directed for the satisfaction of the court, where an action could not be framed so as

to meet the question. The distinction between the two kinds of erection or operation is obvious; and the soundness of that discretion seems undeniable, which would be very slow to interfere where the thing to be stopped, while it is highly beneficial to one party, may very possibly be prejudicial to none. The great fitness of pausing much before we interrupt men in those modes of enjoying or improving their property which are *prima facie* harmless, or even praiseworthy, is equally manifest. And it is always to be borne in mind that the jurisdiction of this court over nuisance by injunction at all is of recent growth; has not till very lately been much exercised; and has at various times found great reluctance on the part of the learned judges to use it even in cases where the thing or act complained of was admitted to be directly and immediately hurtful to the complainant. All that has been said in the cases, where this unwillingness has appeared, may be referred to in support of the proposition which I have stated, as in *Attorney-General* v. *Nichol*, 16 Ves. Jr. 338; *Attorney-General* v. *Cleaver*, 18 Ves. Jr. 211; and an *Anonymous Case* before Lord Thurlow, in 1 Ves. Jr. 140, and others. It is also very material to observe, what is indeed strong authority of a negative kind, that no instance can be produced of the interposition by injunction in the case of what we have been regarding as eventual or contingent nuisance, but some authorities approach very near the ground upon which I have relied. Lord Hardwicke in *Attorney-General* v. *Doughty*, 2 Ves. Sr. 453, speaks of plain nuisances, and a plain case of nuisance, as contradistinguished from others, and entitling the court to grant an injunction before answer. Lord Eldon appeared at one time (*Attorney-General* v. *Cleaver*) to think that there was no instance of an injunction to restrain nuisance without trial; but though this cannot now be maintained, it is clear that in other cases where there appeared a doubt—as in *Chalk* v. *Wyatt*, 3 Meriv. 688 —the injunction was said only to be granted because damages had been required at law. The course which has been pursued at law with respect to different kinds of obstructions.

and other violations of right furnishes a strong analogy of the same kind. Lord Hale, in a note to Fitzherbert, Nat. Brev. 184, *a*, speaking of a market holden in derogation of a franchise, says that if it be kept on the same day it shall be intended as a nuisance, but if it be on another day, it shall be put to issue whether it be a nuisance or not; and the case of *Yard* v. *Ford*, 2 Saund. 172, seems to recognize the same distinction."

Some other observations may not be inapplicable before I proceed to an examination of the testimony of the witnesses in respect to the materiality of the obstruction to the navigation of the Christiana River by the erection of the proposed wharf.

What is a river?—"A land current of water bigger than a brook." (Johnson, Dict.); "A large stream of water flowing in a channel on land toward the ocean, a lake, or another river; a stream larger than a rivulet or brook." (Webster, Dict.). Every river, be it public or private, has a bed, shore, and bank. Houck, Riv. § 6; *Gairt* v. *Chambers*, 3 Ohio, 496.

The bank is the outermost part of the bed in which the river naturally flows. The bed is covered by the river, and is the space subjacent to the river through which it flows. The shore (Saxon)—The coast of the sea; the bank of the river; that part of the bed lying between the top of the bank and that part of the bed where the water actually flows and which, as the water rises and falls, is land or water. (Johnson, Dict.).

"In the channel or hollow containing a river, the Roman Law has distinguished the *alveus* or bed of the river and the *ripa* or bank; the river itself being *aqua*, water. All above high water mark they distinguished as *ripa*, bank, and all below as *alveus*, or bed." State papers by Jefferson, entitled *Land in New Orleans, the Batture*, and quoted in Houck, on Rivers.

The same terms have the same extent in the language of our law likewise; but we distinguish by an additional name

that band or margin of the river which lies between the high and low water marks,—we call it the beach or the shore.

The shore may therefore be defined as the land between the high and low water marks.

Webster thus defines "shore": "The coast or land adjacent to the ocean or sea or to a large lake or river." This word is applied primarily to the land contiguous to water, but it extends also to the ground near to the border of the sea, or of a lake, which is covered with water. We also use the word to express the land near the border of the sea, or of a great lake, to an indefinite extent, as when we say a town stands on the shore; we do not apply the word to the land contiguous to a small stream.

The commissioners named in the Act to regulate the building of wharves in the City of Wilmington, February 6, 1855, were appointed to view the Christiana River, and thereupon to adjust and determine a limit upon each side of the River Christiana to which wharves may hereafter be extended out into said river. Now it is evident that the object and purpose was not to prevent wharves being extended out into the river by determining a limit or line at such a distance from the river that wharves could not be extended into it. The purpose, on the contrary, must have been, judging from the words of the Act, to so adjust a wharf line that the river should be made available to the people for commercial purposes, one means of which is the erection of wharves. The commissioners named in the Act of 1869 were appointed to readjust, alter, fix and determine the limits and distances to which wharves might be extended out into the river or along the margin of said stream,—not to readjust, alter, fix and determine the limits and distances to which wharves might not be extended into or along the margin of said streams, but away from said stream and at a long distance from the margin of said stream. Confiding to the commissioners to act in accordance with the purposes and objects of the Act as clearly manifested by its terms, the Legislature provided in § 3 of the Act that "From and after the expiration of one year from

the passage of this Act, it shall not be lawful to construct or cause to be constructed, or to have or keep on either side of said river between the points where the southwesterly boundary of the city crosses the river and its junction with the Brandywine Creek, and within the limits to be adjusted and determined as aforesaid (that is to say, between either one of said limits and the shore with respect to which such limit shall be fixed), any wharf or platform supported on piles, piers or abutments so fixed as to leave spaces between them open to said river ; or to construct or cause to be constructed, have or keep between the aforesaid points and within the limit to be adjusted and determined as aforesaid, any sluiceway or sluice-ways in any wharf built or to be built on said river." Believing that the commissioners appointed in these Acts would perform the duties for which they were appointed, in accordance with the meaning of the Acts, the Legislature, in § 4 of the original Act, the provisions of which section are extended to and made part of the Supplement of 1869, provided the penalties for the obstruction of the said River Christiana hereinbefore recited.

No provision was made in the Acts for a review of the action of the commissioners.

The wharf line fixed by them was in some respects different from that which, we must reasonably suppose, was contemplated by the Legislature. It was in some respects such as precluded riparian owners from extending wharves into the river, and was in some instances, and notedly in the case of the defendant, distant from the margin of the river or stream. It was extended upon his lot about 39 feet south of the Holland Marsh Company's bank, which was a legal embankment, or embankment authorized by law, existing for more than one hundred years, and through which the defendant could not legally cut, drain or dredge so as to have access to the navigable portion of the river by means of a wharf, pier or other structure. If he had cut through said embankment, he would have subjected himself to the penalties provided in the Act creating the Holland Marsh Company.

5 DEL. CH.                30

While, therefore, I am clearly of the opinion that the said several Acts referred to are constitutional, I think the fixing of the wharf line by the commissioners upon the lot of the defendant in the manner and at the place they did, was, to say the least, a very questionable exercise of the power vested in them.

Will the building of the proposed wharf by the defendant be a material obstruction to the navigation of the Christiana River, and therefore be a public nuisance? It will be impracticable to state in detail all the evidence of the witnesses in respect to this question; I can only state their conclusions, with some of their reasons therefor.

George G. Lobdell thinks the wharf would be the means of forming deposits at that part of the stream, as proved by the result in all cases that have come under his knowledge where wharves have been built on piles, and would be a public nuisance.

George W. Bush thinks the proposed wharf would be injurious to general business interests connected with navigation, and would be an obstruction to navigation.

Charles Moore thinks that if the wharf should have less width than below Market Street, it would be objectionable and a nuisance,—it would accumulate sand both below and above the bridge; the only objection he sees would be the narrowing the stream which would be an obstruction to all property owners, both above and below; it will cause an accumulation just west and east, but that, in his opinion, instead of being an injury, would be a benefit,—it would act simply as a jet.

Henry Mendenhall says that the wharf would tend to contract the width of the river at that point, and would, he thinks, be a serious injury, and a very serious matter for anyone to build wharves that do not conform to the commissioners' wharf line.

John Taylor Gause—the Vice-President of the Harlan & Hollingsworth Company, and who states he owns nearly one half of the stock of the company—says the wharf would

be a serious obstruction to the navigation of the stream, because it curtails the width, making the navigable part that much narrower than it is at present.   It would have an effect upon the navigation of the creek beyond that precise point, for the reason that such a wharf would increase the depth of mud in its own vicinity and be an obstruction.   It would increase the deposit above the stream beyond it; and all such deposits, unless taken away by dredging, have the effect to narrow the stream and reduce the flow of water that comes in at flood tide.   It would be more objectionable because of its peculiar location on the point of the bend.   The tendency of all streams where the tide ebbs and flows would be to become more narrow at a bend, because the mud or sediment is inclined more to settle upon the convex side of the point referred to, because the water moves more slowly and it eddies and leaves its deposits.

Mr. Gause also says: "If large vessels were lying at the complainant's wharf and the defendant's wharf, it would be almost impossible for a vessel to pass up and down the stream, when the current was strong, without doing damage to one or the other of the steamboats, or being damaged herself."

Mr. Gause sums up his testimony by saying: "I consider the building of that wharf would be an injury in four particulars,—one would be that it would be a direct injury to our property on the south side in the manner I have explained; secondly, it would be a direct injury and a great inconvenience to the property on the north side; thirdly, it would be a great injury to the free navigation of our river and the value of our river for commercial purposes; fourthly, such a wharf, built in defiance of law and contrary to the stipulations of the wharf commissioners, would set an example to any and every person to go out in the stream with their wharves as inclination might lead them, or as self-interest might prompt them, until, if persons were allowed to do so unrestricted, the injury to the commerce of our Christiana and the trade of our city would, in my estimation, amount to millions of dollars in the future, because such injuries could not be repaired."

Charles W. Talley, in answer to the question, what effect upon the navigation of the Christiana River the building of the proposed wharf by the defendant would have, says: " I cannot see how the navigation of the Christiana would be obstructed by any wharf built on piles or otherwise, 13 feet inside of mean low water. It is not navigable there now, and the building of a wharf would not interfere, as I can see, with the navigation. He says that the building of a wharf would not in any way obstruct the navigation of the Christiana Creek, and explains why he says so as follows : " There is a mud bank there now, and vessels cannot sail there at the present time, and, by building there, a wharf would certainly not injure the navigation. If there was an extra high tide it would allow a rowboat to be rowed over the bank, or it would allow you to place a raft of logs there; but if the wind should be to the northwest for a day or so, you would not be able to float the logs off, because there would not be sufficient water even at high water, and you would not get them off."

On cross examination he says : " Mr. Paschall's wharf, as proposed, would have the same effect as though Mr. Paschall built nothing, as dirt would be there; and the wharf, if anything, would be a benefit to the navigation; for if Mr. Paschall has a wharf there he would be compelled to dredge, say at least 13 feet—that is, between his wharf front and low water mark—thereby improving the navigation of the river 13 feet."

Charles E. Sparks says he does not think the proposed wharf would be an obstruction to the navigation of the Christiana Creek ; that vessels don't often come in that close.

Enoch Moore, Jr., says " that the wharf of Mr. Paschall would not hurt the navigation of the creek. If anything, it would be a benefit. It would have a tendency to cut away the mud flat, and either widen the channel or throw it more on the south side." He thinks it would be a benefit, as the channel now is all on the north side.

Jacob Pusey·says that he does not think the proposed

wharf of the defendant would be an obstruction to the navigation of the said creek; and that he thinks that if the creek was wharved along on both sides all the way along, it would be an advantage, and every wharf built is just that much of an advantage.

Charles M. Bird says that he does not think the proposed wharf of the defendant would be an obstruction to the navigation of the Christiana Creek. He has charge of the work of dredging out the channel. He does not think it would affect the navigation at all. He does not see how a wharf as proposed by Mr. Paschall would cause any difficulty in the navigation of the stream in front of the complainant's works.

William G. Gibbons says that he is unable to see that the proposed wharf of the defendant would have any effect whatever upon the navigation of the stream; and that, in his opinion, it could not be an obstruction to the navigation of the Christiana Creek for the reason that it would be far away from the channel.

Charles Green says that the proposed wharf of the defendant would be no objection, and would be no obstruction to the navigation of the Christiana River.

Ephraim T. Walton says that, as far as he is able to judge, the wharf, as proposed to be built by the defendant, would not be an obstruction to the navigation of the creek.

There is a great amount of testimony *pro* and *con*, bearing more or less directly upon the main question, whether the construction of the proposed wharf by the defendant would be a material obstruction to the navigation of the Christiana River and therefore a public nuisance.

I have extracted what I regard as the most material portion bearing on the question. The witnesses are all credible, and appear to have enjoyed ample opportunities to enable them to form correct opinions in respect to the matter upon which they were called to testify. I confess that throughout this investigation I have justly appreciated the reason and justification for the remark made by Mr. Gibbons to the master of the tug, who had frequently spoken of the difficulty

of that particular place (opposite the complainant's wharves), viz.: that the Harlan & Hollingsworth Company should be accorded a right to keep its vessels there; that they were a very important interest for the city; and that he, on his part, should use more than ordinary care and diligence in getting his tows by without damage to the tow, or other vessels, and not to have any particular noise about it. That company is a very important interest, not only to the city, but in some respects to the State. It affords employment to hundreds of men. By its skill and enterprise it has reflected credit upon the State, and I should extremely regret if any official act or official omission to act on my part should work an injury either to that company or to the defendant.

They both have their rights, which are entitled to equal and the same consideration before this tribunal. I can only administer equity in accordance with her established principles as she by her oracles has declared them; and she has thus declared that " Courts of equity will grant an injunction to restrain a public nuisance only in cases where the fact is clearly made out upon determinate and satisfactory evidence. For if the evidence be conflicting and the injury to the public doubtful, that alone will constitute a ground for withholding the extraordinary interposition." 2 Story, Eq. Jur. § 924, *a.*

The injunctive power of the court of chancery is its strong arm, and should not be incautiously exercised. In my judgment the fact that the proposed wharf, if built, will be a material obstruction to the navigation of the Christiana River, and therefore a public nuisance, is not clearly made out upon determinate and satisfactory evidence. On the contrary, the evidence is conflicting and the injury to the public is doubtful. The doctrine applicable to public nuisances is equally applicable to cases of private nuisances. " But when private individuals suffer an injury quite distinct from that of the public in general, in consequence of a public nuisance, they will be entitled to an injunction and relief in equity, which may thus compel the wrongdoer to take active measures against allowing the injury to continue." *Id.*

In the present case the complainant states in its bill that the proposed wharf, if constructed, will be a public nuisance; and that the complainant will suffer an injury distinct from that of the public in general, in consequence thereof, and prays relief in equity. The evidence in the case being conflicting, and the injury to the public doubtful, the complainant has failed to make out, upon determinate and satisfactory evidence, that the wharf, if made, would be a public nuisance; and his right to file a bill in his own name, as suffering distinct injury from that of the public in general in consequence of the character of the proposed structure, cannot be admitted. Even had the bill in this case been filed in the name of the Attorney-General, this court would not have felt free to grant an injunction, for the reasons already stated.

"In regard to private nuisances the interference of courts of equity by way of injunction is undoubtedly founded upon the ground of restraining irreparable mischief, or of suppressing oppressive and interminable litigation, or of preventing multiplicity of suits. It is not every case which will furnish a right of action against a party for a nuisance which will justify the interposition of courts of equity to redress the injury or to remove the annoyance. But there must be such an injury as from its nature is not susceptible of being adequately compensated by damages at law, or such as, from its continuance or permanent mischief, must occasion a constantly recurring grievance which cannot be otherwise prevented but by an injunction. Thus it has been said that every common trespass is not a foundation for an injunction, where it is only contingent, fugitive or temporary. But if it is continued so long as to become a nuisance, in such a case an injunction ought to be granted to restrain the person from committing it. So a mere diminution of the value of property by the nuisance, without irreparable mischief, will not furnish any foundation for equitable relief." 2 Story, Eq. Jur. § 925.

"On the other hand, where the injury is irreparable, as, where loss of health, loss of trade, destruction of the means

of subsistence, or permanent ruin to property may or will ensue from the wrongful act or erection, in every such case courts of equity will interfere by injunction in furtherance of justice and the violated rights of the party." *Id:*

In the case before me the injury which the complainant will suffer, as distinct from that which the public in general will suffer, according to the proof, appears to be uncertain, contingent, speculative or remedial at law, and not so ruinous to property as will justify the interference of this court, by injunction, in furtherance of justice and the violated rights of complainant—real or reasonably to be apprehended—to restrain the defendant from erecting the proposed wharf.

The injunction prayed in this case is therefore refused, and the bill of complaint is dismissed, with costs, on the usual terms.