# CASES IN CHANCERY.

## DELAWARE.

RICHARD C. DALE,

*vs.*

ROWLAND SMITH AND JOSEPH TERRAPIN.

*New Castle, Aug. T. 1814.*

Parol evidence of intention. in the absence of fraud, surprise or mistake, is inadmissible to vary the description of land in a written contract of sale.

Written contract for the sale of " a tract of land situated in Appoquinimink Hundred, *containing by deed* 200 *acres, be the same more or less.*" Upon a subsequent survey. made according to the description in the deed referred to, the tract was found to contain 317 acres    *Held,* that parol evidence was not admissible to show that the parties intended the sale of a less quantity than the entire tract covered by the description in the deed.

Where the description in a deed calls for certain natural boundaries, these are controlling, and effect will be given to them in applying the description to the premises, although thereby a larger quantity of land may be included than the deed specifies.

BILL FOR SPECIFIC PERFORMANCE.—The complainant, Dale, by a written article of agreement, dated the 26th of September, 1812, contracted to sell and convey to the de-

I

fendants, Terrapin and Smith, a tract of land in New Castle County; the written agreement being as follows, viz:

" Articles of Agreement, made and concluded on this 26th " day of September 1812, between Richard C. Dale of the " State of Delaware, of the one part, and Joseph Terrapin " of the State of New Jersey, and Rowland Smith, of the " State of Pennsylvania, of the other part, witness, that the " said Richard C. Dale, for the valuable consideration of " the sum of seven thousand dollars, does bargain and sell " to Joseph Terrapin and Rowland Smith a tract of land, " situated in Appoquinimink Hundred, *containing by deed* " *two hundred acres, be the same more or less ;* for which he " binds himself to give a general warranty deed, upon the " said Terrapin and Smith making their first payment on " the 25th of December next ensuing the date thereof.   It " is further understood and agreed between the parties, that " the present year's rent belongs to Richard C. Dale, who " promises to give the said Terrapin and Smith *immediate* " *possession and use of the woodland generally, and of all the* " *wood now cut and corded in the woods,* and quiet and peace- " able possession of the buildings and premises on the 25th " of March next ensuing the date hereof.  All which condi- " tions on my part I pledge and obligate myself to comply " with.   As witness my hand and seal this 26th of Sep- " tember, 1812.

　　　　" (Signed),     RICHARD C. DALE.   { L. S. }

·" *Witness present,*
" WILLIAM C. HANCOCK."

The deed referred to in the articles was an indenture of bargain and sale from Henry Drinker and wife to Bridget Colgate, who was the complainant's grandmother dated 7th September, 1771.

No survey of the premises was made prior to the date of the agreement, in order to ascertain the quantity of land contained within the lines of the old deed referred to. Pending the negotiation, the parties, while together, looked at the deed and calculated the quantity at 215 acres, 2 roods, 20 perches. The complainant then offered to throw in the excess beyond two hundred acres to the extent of two hundred and fifteen acres. Sometime after the written agreement had been executed the complainant caused a survey to be made, at which, on two occasions, first one and then the other of the defendants was present. This survey ascertained the contents of the tract to be three hundred and fourteen acres, being one hundred and fourteen more than the number of acres called for in the deed referred to in the agreement. Thereupon, the complainant, claiming the right to reserve the excess of one hundred and fourteen acres, tendered a deed for two hundred and fifteen acres, which deed the defendants refused to accept, insisting upon a conveyance of the whole tract. The defendants, having under the agreement received immediate possession of the woodland, (which embraced mainly the one hundred and fourteen acres found to be in excess) proceeded to cut off the wood. This bill in equity was filed to restrain the defendants from committing further waste upon the one hundred and fourteen acres; also to compel them to accept a conveyance of two hundred and fifteen acres, and to perform the agreement on their part.

The defendants, by their answer, admitted the treaty for the purchase of the land; also the written contract in the terms set forth in the bill, and the giving of security by bond for the purchase money; but they alleged that pending the negotiation and while the defendants, together with the complainant, were examining the land, the latter stated that the quantity would overrun the two hundred acres called for by the deed under which complainant held title; that they refused to purchase by the acre on survey,

but made their offer of $7000 for the whole tract, according
to the metes and bounds shown to them; and that the
purchase was made with the understanding on their part
that it should embrace the whole tract. The answer de-
nied any agreement or understanding that the defendants
were to pay for any surplus which might be ascertained
upon a survey.

Issues were joined and depositions taken on both
sides. The evidence consisted chiefly of acts and declara-
tions, on the part of both parties, bearing upon the question
what they respectively understood to be the meaning of
the contract, whether it was a contract for the whole tract,
more or less, covered by the old deed, or whether only for
the two hundred and fifteen acres which was the estimated
quantity pending the negotiation for sale. This evidence
consisted mainly of declarations by both Terrapin and
Smith to the effect that they had purchased two hundred
acres for $7000, and that the complainant had given in
fourteen or fifteen acres. On the other hand, it was proved
that the complainant had frequently spoken of the sale in
terms implying that it embraced the entire tract ; that he
once called it " his farm," at another time, " the old place,"
and at another, the " tract of land which came by his
grandmother," who was the grantee in the old deed ; and
that on no occasion had the complainant spoken of hav-
ing reserved any part of the tract; further, that he had,
after the sale, spoken of his being left without fire wood
from this tract, all the wood being on the one hundred and
fourteen acres in dispute. It was also proved that, in show-
ing the tract for sale, the complainant rode over the whole
of it ; also,that some years previously he had been informed
by a surveyor that the tract contained one hundred acres
more than the quantity called for in the deed.

The cause came before the Chancellor at the August
Term,1814, for hearing upon the bill, answer, exhibits and
depositions.

*Read, Rodney* and *Van Dyke,* for complainant.

*Rogers* and *Broom,* for defendant.

RIDGELY, CHANCELLOR.—The articles · of agreement, signed by the complainant on the 26th of September, together with the deed referred to, furnish the only guide by which the real contract of the parties can be ascertained. The intention of the parties must be sought there. The complainant's counsel rightly observed, that this is a question of intention and construction ; but then, the intention must be discovered from the construction of the articles. And further, the deed of Drinker and wife to Colgate, of the 7th September 1771, became part of the agreement, and the extent of the agreement must be ascertained by that deed.

No circumstance has appeared by which it becomes necessary to resort to parol evidence. There is no surprise, no mistake, no fraud. Every act of the complainant was done with his eyes open, and with sufficient knowledge of the quantity of land, and without the least practice on the part of the defendants to draw him into any new or different agreement.

It is unnecessary to run through all the cases which this subject affords. They generally turn upon particular circumstances. Fraud will vitiate a deed, and parol proof may be given of the fraud ; but then, the party obtaining the deed must be guilty of the fraud. And unless there be some *suppressio veri* or *suggestio falsi*—some circumvention— the deed must stand on its own ground. Here, there is no such thing ; and moreover, the complainant was perfectly informed of every fact necessary in disposing of this land.

Fraud is what is done in secret, and where there is a concealment from the party in a matter which concerns his interest. 2 *Atk.* 559, 561. In 2 *Atk.* 383, 4, Lord Hardwicke says, " to add anything to an agreement in

writing, by admitting parol evidence which would affect land, is not only contrary to the statute of frauds and perjuries, but to the rule of the common law before that statute was in being."

The reasoning of Lord Thurlow in the case of *Lord Irnham vs. Child,* 1 *Bro. Ch. Rep.* 92, is peculiarly applicable. That was a grant of an annuity. On settling the terms, it was agreed that the annuity should be redeemable, but the parties, supposing that this appearing on the face of the transaction would make it usurious, agreed that the grant from Lord Irnham to Child should not have in it a clause of redemption, and so it was drawn and executed. Upon a bill filed to redeem, alleging that such was the agreement, parol evidence was read, but the Lord Chancellor would not relieve. He said the rule is perfectly clear, " that where there is a deed in writing, it will " admit of no contract which is not part of the deed. " Whether it adds to, or deducts from the contract, it is " impossible to introduce it on parol evidence." Again, he says, " if the agreement had been varied by fraud, " the evidence would be admissible. The argument must " then be to impute fraud to the party. The rule of evi " dence is not subverted if there is clear proof of fraud. " The committing of the agreement to writing is an argu " ment against fraud. Then as to mistake or accident— " suppose it was a very clear thing that one agreement " was intended, and that by accident it was extended far- " ther. But there is no such case in the books. If admitted " to be a mistake, the Court would not overturn the rule " of equity, by varying the deed ; but it would be an equity " *dehors* the deed. Then it should be proved as much to " the satisfaction of the Court as if it were admitted. The " difficulty of this is so great, that there is no instance of " its prevailing against a party insisting that there was no " mistake."

In 1 *Vesey Jr.* 241, *Hare v. Shearwood,* where it was attempted

to prove an agreement made on the purchase of an annuity that it should be redeemable, Mr. Justice Buller, sitting for the Lord Chancellor, said, that the case was an attempt to carry the rule of evidence in that court further than had ever been done, and that it was not supported by any precedent or authority ; that it was not one of the excepted cases, which are cases of fraud and where the party will admit there was some agreement.

In 2 *Bro. Ch. Rep.* 219, *Portmore vs. Morris*, Lord Kenyon, then Master of the Rolls, in a like case, to prove by parol evidence that an annuity was redeemable, said, " before the statute of frauds, parol evidence could not " be admitted to contradict written agreements, except in " very particular cases indeed, and afterward deeds were " under the same rule. If fraud was imputed, it might be " done here; but it is dangerous to depart from the " deeds. It might be the intention that the annuity " should be redeemable, but I can only get at it by de- " molishing one of the foremost rules of law ; therefore I " reject the evidence."

The case of *Brodie vs. St. Paul*, 1 *Vesey Jr.* 326 is very strong. There, there was a treaty between the parties about letting a farm. The defendant read from a paper certain items as the terms of their agreement, and an agreement was drawn up with reference to that paper ; and. that agreement, signed by both parties, was deposited in the hands of a third person. They were to meet again to complete the business. They met, but differed about the clauses read from the paper. A bill was filed for a specific performance of the agreement signed, according to such clauses as had been read from the paper. Parol proof was given. Buller, Justice, sitting for the Lord Chancellor, said, there was a wide difference between referring generally to a paper, and referring to such part as was read : " for where the reference is general, the paper if sufficiently described, speaks for itself ; but here the

whole is to depend upon parol ;" p. 333. And again, he said, " the question here is, what is the agreement ? " The whole depends upon parol. If the agreement is " *certain and explained in writing signed by the parties*, that " binds them ; if not, and evidence is necessary to prove " what the terms were, to admit it would effectually break " in upon the statute, and introduce all the mischief, incon- " venience and uncertainty the statute was designed to " prevent. The only thing to support this case would be " to prove by parol evidence, which of these covenants " were read and which were not. That is directly prohib- " ited by the statute, and therefore the bill must be dis- " missed."

The last case which I shall cite is *Rich. vs. Jackson*, 4 *Bro. Ch. Rep.* 514. Stiles and Jackson were in a treaty about a lease. It was mentioned by Stiles and Jackson, in the presence of witnesses, that Stiles was to receive 80 guineas a year for the premises, *clear of all taxes.* Jackson drew up the memorandum in his own handwriting ; the agree- ment to pay the taxes, or that the rent should be clear of all taxes, was omitted. This memorandum was signed by Stiles and Jackson.

Lord Chancellor Loughborough, said that, " believing " the witnesses, it was impossible to mistake the meaning " of the parties that the rent to be paid was meant to be a " clear rent, but the parties had concluded the matter by a " written agreement, which was that a lease should be " granted for twenty-one years, at eighty guineas a year, " and the tenant paying his twenty guineas a quarter, in- " cluding in it his land tax receipt. It can only be accord- " ing to the sense the law puts upon it."

Again, he says " I have looked into all the cases. I can- " not find that the Court has ever taken upon itself to add " to the form of the agreement ; but in repeated instances " the Court has refused to do so, though it has been insisted

" that the parol evidence of the adverse party has shown " the written agreement to be against conscience." And further he adds, " it is quite impossible to admit the rule " of law to be broken in upon, and that requires that noth- " ing should be added to the written agreement unless in " cases *where there is a clear, subsequent and independent agree-* " *ment varying the former, but not where it is of matter passing* " *at the same time with the written agreement.*"

Now, if we take these decisions as forming a rule by which the case under consideration should be determined, it is plain that the parol evidence read in this cause ought not to control nor in any degree to influence me in the construction of the articles of agreement made the 26th of September, 1812. In the articles, the complainant binds himself to convey a tract of land containing by deed two hundred acres, be the same more or less. The deed here referred to became a part of the contract, and the party is confined to the boundaries in that deed; that is, to grant to the defendants to the same extent that Henry Drinker granted to Elizabeth Colgate. According to that deed, an old corner maple, standing by the side of the branch, is the place of beginning; from thence, the first line was north two hundred and thirty perches to an old corner gum standing in a Pocoson. To give the proper effect to the distance of this line, it must extend to the gum. That is a natural boundary, in which there can be no mistake; and so the second line must extend to the white oak, and the third to the live oak, and thence to the first mentioned corner maple. If the first line stops at the end of two hundred and thirty perches, the gum, the white oak and the live oak are thrown out of the description of the land, and are made to mean nothing. And this would be directly contrary to the written agreement. According to this article, and to the deed referred to, we must go to the natural boundaries. This is the construction which has ever been given to papers describing or calling for natural

2

boundaries, and it accords with justice and sound sense. Besides, the complainant, by the article, agreed to give the defendants immediate possession and use of the *woodland generally*, and of *all the wood then cut and corded in the woods*. By the " woodland generally," I understand *all the woodland*, and this construction is confirmed by the agreement to give up also all the wood then cut and corded in the woods. Wood had been cut promiscuously on the land, as well on that part which the complainant says he intended to sell, as on that part which Smith and Terrapin contend they also purchased. As the complainant agreed to give up not only the wood cut, but the woodland generally, without any limitation, I am at a loss to perceive how the defendants can be restrained to any particular spot. Their right equally extends over the whole, according to the description of the deed, and according to this agreement to give them the immediate possession and use of the woodland generally, and of the cut and corded wood. Viewing this case in all its parts and upon all the evidence, I can put no other construction on the transaction.

It appears that a survey was made after the contract had been executed, *but such survey was not a clear, subsequent, independent agreement, varying the former.* Although Smith acquiesced in its being made, yet he never agreed nor intended that it should supersede the boundaries limited and fixed in the deed of Drinker and wife. No agreement was made at the time of the survey. The articles of the 26th September were not dispensed with nor annulled. The survey seems to have been an experiment made by Dale on his part, probably with the intention of fixing the agreement of the 12th September to the neat distances called for in the deed, but not thereby to make a new, independent agreement. Neither did Smith, who was present, intend any alteration. This is not pretended. Indeed the survey is said in argument to have been made in execution of the agreement. The written agreement must then be resorted

to as the only clear, satisfactory legal evidence of the contract made by the parties.

Let the injunction be dissolved and the bill dismissed.

On appeal, this decree of the Chancellor was affirmed by the High Court of Errors and Appeals at the June Term, 1817.