STATE of Delaware ex rel. David P. BUCK-
SON, Attorney General, Plaintiff,

v.

The PENNSYLVANIA RAILROAD COMPA-
NY, a corporation of the Commonwealth
of Pennsylvania, Defendant.

Superior Court of Delaware.

New Castle.

Feb. 21, 1967.

David P. Buckson, Atty. Gen., and Ruth M. Ferrell, Deputy Atty. Gen., for plaintiff.

James L. Latchum, of Berl Potter & Anderson, Wilmington, for defendant.

DUFFY, Chancellor :[1]

This is an action for a declaratory judgment by the State of Delaware on the relationship of the Attorney General against The Pennsylvania Railroad Company ("The Pennsylvania"). The Pennsylvania counterclaimed for a judgment in its favor and issue was joined on its motion for summary judgment.

The controversy is over title and related rights to certain "foreshore", which is a strip of soil between high and low watermarks on the westerly side of the Delaware River. The State claims title and so does The Pennsylvania's lessor, The Philadelphia, Baltimore and Washington Railroad Company ("The P. B. & W."), from whom The Pennsylvania holds under a 999-year lease. The beginning and ending dates under that lease are not significant for present purposes.

[1]. Sitting by assignment under the provisions of Art. 4 § 13 of the Delaware Constitution, Del.C.Ann.

## I

The P. B. & W. is the record owner of four contiguous parcels of land which lie on the westerly side of the Delaware River in New Castle County between Edgemoor and Bellevue. The boundary on the River side is about 4500 feet. Title to the foreshore adjacent to these uplands is the title in dispute.[2]

On November 19, 1946 the United States Corps of Engineers, acting under 33 U.S.C. § 403, issued a permit to The Pennsylvania authorizing it to place fill in the Delaware River along the uplands and out to a point 800 feet east of the river (most easterly) rail on The Pennsylvania's northbound track. At the southern end of the area, fill was limited to 600 feet out because of proximity to the River channel. The original permit was extended on three occasions, the last date being April 20, 1962. Since 1946 The Pennsylvania has been filling in the River out to a point some 600 feet east of the river rail. The precise extent of the fill is in dispute.

## II

Stated narrowly, the question before the Court is: does The Pennsylvania's title and its right to fill run to low watermark in the Delaware River as it claims, or to high watermark as the State contends, and where are those marks located?

## III

Delaware claims title to the foreshore on the ground that, as the State which came into being with the Declaration of Independence, it succeeds by that event and the Treaty of Paris in 1783 to all real property owned by William Penn and his successors in interest. The State argues that neither it nor the Penns nor any other predecessor in title conveyed out this particular foreshore. Hence, says the State, it is the lawful owner thereof.

The Pennsylvania argues that, under deeds and other pertinent documents in its chain of title, the foreshore is included in its ownership and that it is the lawful owner of all subaqueous land contiguous to its upland out to and as far as mean low watermark in the Delaware River. It also relies on its rights as a riparian owner and upon other legal theories discussed below.

## A. THE STATE'S RECORD TITLE

According to its brief, the State's title chain in this case "is the same one that was upheld in State of New Jersey v. State of Delaware", 291 U.S. 361, 54 S.Ct. 407, 78 L.Ed. 847 (1934).

The origin of that title is the deed of feoffment given to William Penn by the Duke of York on August 24, 1682 for lands within the 12-mile circle around New Castle "scituate lying and being upon the River Delaware." Title to this land inured by estoppel to William Penn when letters patent for it were eventually issued to the Duke of York by Charles II on March 22, 1682/3.[3] Prior to 1682 the Duke of York had been in continuous possession of the lands (except for a brief

---

2. In briefing and argument the parties have regarded The Pennsylvania as the claimant to title of the area in controversy and thus the real party in interest. The Court will do likewise.

3. The precise description of the tract is: "All that the Towne of Newcastle otherwise called Delaware and the fort therein or thereunto belonging scituate lying and being between Maryland and New Jersey in America And all that Tract of land lying within the Compasse or Circle of twelve miles about the said Towne Scituate lying and being upon the River of Delaware and all Islands in the said River of Delaware and the said River and Soyle thereof lying North of the Southermost part of the said Circle of twelve miles about the said Towne And all that Tract of Land upon Delaware River and Bay beginning twelve miles South from the said Towne of Newcastle otherwise called Delaware and extending South to Cape Lopen."

period in 1673/1674) from September 30, 1664, when he took them from the Dutch.

It is undisputed that the foreshore here at issue is within the 12-mile circle.

The State relies on a title in William Penn and his successors after 1682 and until the war of independence with England. The State's claim to title thereafter is based on a transfer in law on July 4, 1776 and a confirmation of that transfer by the Treaty of Paris in 1783.

In summary, the title chain upon which the State relies, going backward in time, is, first, the war of independence, then, the successors to Penn, then Penn himself, and finally the Duke of York.

## B. THE PENNSYLVANIA'S RECORD TITLE

The four contiguous tracts to which The P. B. & W. holds record title are bounded, generally speaking for present purposes, on the south by lands of E.I. duPont de Nemours & Co., on the west by the tracks of The Pennsylvania, on the north by Dog Creek, and on the east by the Delaware River. In the briefs these are identified as Parcels Nos. 35, 25, 39, and 38. For illustrative purposes (not to scale), the tracts are related as follows:

## (1) RECORD TITLE TO PARCEL NO. 35.

The P. B. & W. acquired title to this parcel in 1918 as part of 12.07 acres under a deed which calls for "low water line of the Delaware River" as its easterly boundary. The deed includes "riparian and and other rights" of the grantor and

> " * * * all muds, flats and land under water in front of land contiguous to the said land extending as far into the channel of the said River as the right, title and interest of the said party of the first part extends by law or custom."

Back to about 1889, all prior deeds in the title chain include a call to "low water mark on the Delaware River" (or its equivalent) as the easterly boundary, and most, if not all, of them include a course which generally appears as "thence by said low water mark".

Prior to 1889, Parcel No. 35 was part of a 144-acre tract, the northerly boundary of which ran "to a stone on the Delaware River Bank" and which included

> " * * * the mud flats to low water mark, containing 144 acres, more or less."

An 1832 partition proceeding in the Orphans' Court identified the easterly boundary (of a 144-acre tract) struck by the Commission as running "by the Delaware River", and the deed immediately prior thereto, in 1791, described the easterly boundary as running up the River. For a long period prior thereto, title passed by devise or intestacy.

Under date of September 10, 1688[4] a resurvey of an 827-acre tract, of which Parcel No. 35 is a part, included a course which is

> " * * * to a cor black oak standing by the River, thence up the River to the place of beginning * * *."

This tract (at Vertrietige Hook) was originally patented by the Dutch in 1663, and that patent was confirmed in 1667 by Richard Nicholls, a Governor under the Duke of York, and again confirmed by Governor Francis Lovelace in 1670. The descriptions in these earlier patents are general, but it is undisputed that they are in The Pennsylvania's title chain.[5]

* * *

Thus it appears that deeds in the abstract to Parcel No. 35 have specifically included a call to low water line or mark for more than 75 years, and for more than 50 years prior thereto deeds specifically included mud flats to low water mark. And deeds prior to 1832 ran the boundary to and along the Delaware River. The resurvey of 1688 specifically fixes the closing course as "up the River".

## (2) RECORD TITLE TO PARCEL NO. 25:

The P. B. & W. acquired title to this parcel in 1908 by a deed conveying 4.9 acres, the easterly boundary of which proceeded by courses and distances along the "line of mean high water mark on the western side of the Delaware River". And that deed also conveyed.

> " * * * all muds, flats and land under water in front of the above described premises as far into the channel of the Delaware River as the title of the party of the first part hereto extends by law or custom."

The deed immediately prior in the chain of title (1901) conveys an estate

---

4. New Castle County Proprietary Warrants & Surveys T-2-15a.

5. The three successive colonial governors under the Duke of York (Nicholls, Lovelace and Andross) confirmed patents issued during Swedish and Dutch tenure, undoubtedly for the purpose of quieting the Delaware settlors and bringing stability to the colony. See I Scharf History of Delaware, 151, 152; The Duke of York Record, pp. 32–198. Penn also confirmed full and quiet enjoyment of the settlors. Duke of Yorke's Book of Laws, p. 160.

"* * * to the land under water in front of the width of said lot or piece of land as far into the channel of the said Delaware River as law or custom permits said right and title to extend."

Earlier deeds back to 1846 recite the easterly boundary as running along the "low water mark" of the Delaware River and include the

"* * * muds, flats, fishing, landings, quarries and appurtenances thereto belonging to low water mark." (Some of these nouns are omitted in some of the deeds).

Deeds of 1828 and 1801 include a boundary line to "the River and continuing the same course through the marsh into the River and thence down the said River" as well as title to the marsh of which the grantor was seized. Earlier transfers are by devise, intestacy and partition to the first entry in the abstract which is the resurvey of 1688 out of which Parcel No. 35 is derived.

* * *

Deeds in the abstract to Parcel No. 25 all run to and along the River side and include, back to 1801 at least, muds, flats or marshes in the River. The resurvey of 1688 here also has the basic description with the closing course which is "up the River".

### (3) RECORD TITLE TO PARCEL NO. 39:

The P. B. & W. acquired title in 1947 to Parcel No. 39 as part of a 5.45-acre tract, the easterly boundary of which runs "along the said Delaware River". The deed also conveys

"* * * all the right, title and interest of the said party of the first part in and to the muds, flats, and land under water of said Delaware River bounding the hereinbefore described lands as far out into the said River as such right, title and interest extends or should extend by law or custom and all riparian rights appertaining thereto."

In prior deeds in the title chain the easterly boundary runs to "low water mark at the side of the Delaware River; thence by said river by said low water line", or to low water mark of the Delaware River. Prior to 1879 one part of this tract came out of the same title chain as Parcel No. 25, and the other part came out of the same title chain as Parcel No. 38.

* * *

The descriptions in this abstract run the boundary at least to the Riverside and, in part, the Parcel is found in the resurvey of 1688 with its closing course "up the River".

### (4) RECORD TITLE TO PARCEL No. 38:

The P. B. & W. acquired title to Parcel No. 38, a 16-acre tract, by deed in 1946. The easterly boundary of that deed is high water mark of the Delaware River, but the deed also conveys

"* * * all riparian rights appurtenant to the land hereby conveyed and the muds, flats and land under water in front thereof and extending as far out into the said Delaware River as the right, title and interest of said parties of the first part extends by law or custom."

A deed immediately prior in the chain of title, dated in 1901, describes the easterly boundary as being along the line of low water mark of the Delaware River. That same course appears in earlier deeds back to 1863 when in a deed of that year the easterly boundary ran "down the Delaware River" and the grant conveyed

"* * * improvements, woods, water courses, and rights, liberties, privileges, hereditaments and appurtenances whatsoever, etc."

Earlier transfers occurred by death, but deeds in the title chain have a boundary call to low water mark in the Delaware River. In 1772 a deed in the title chain identifies the tract as "Beginning at low water mark in Delaware River", and the closing course is to "low water mark in the aforesaid

River, thence down the same and binding therewith." A 1776 deed includes a tract "Bounded—to the Southeast by the River Delaware". Earlier deeds are general in description and not particularly helpful. But the very first abstract entry is a confirmation of patent in 1675 to Charles Petersen by Edmond Andross, Governor of York and Albany, to land on the north side of "Verdrity's Hook", containing 266 acres and which reads:

> "* * * lying on the North side of Verdrity's hook, beginning at a corner red oake, standing by the river syde, running North and by East along the River, * * * containing a layed out for two hundred sixty-six acres of land, with meadow or marsh thereunto belonging and adjoining." [6]

This patent is not drawn on the resurvey of September 10, 1688, but that survey does show on its face that immediately adjoining on the north is "The land of Charles Peterson" and his name appears in the written description on the face of the re-survey as the owner of the land adjoining on the north. There also appear to be some monuments (oak trees) in common.

* * *

It thus appears that this patent, out of which Parcel No. 38 and part of Parcel No. 39 have evolved, borders on the other basic patent out of which the remaining parcels are derived. This patent was given in 1675, some seven years prior to York's grant to Penn.

Recent deeds in this abstract run to high water mark in the River, but the grants have included riparian rights and title to the muds and flats under the River. The 1772 deed puts the River boundary at low water mark, and the patent of 1675 places the east boundary "North and by East along the River".

## IV

A threshold legal question is whether or not The Pennsylvania is a riparian owner.

The Pennsylvania says that the eastern boundary of its property is in the River at mean low water mark and that, in any event, its lands border on and are bounded by the Delaware River. Therefore, argues the Railroad, it is a riparian owner.

The State contends that this is not true, relying on certain surveys included in the appendix to its brief and on a post-argument memorandum.[7] To the extent that the latter argues that as a matter of law foreshore was not included in the patents or grants, I do not consider it pertinent at this point.

■ The Court judicially notices that the Delaware River is a public navigable river in law and in fact. The Daniel Ball, 10 Wall 557, 77 U.S. 557, 19 L.Ed. 999 (1871); The Montello, 20 Wall 430, 87 U.S. 430, 22 L.Ed. 391 (1874).

■ The legal principles for determining whether land is riparian and tests applied in construing deeds and other title instruments are, for the most part at least, fairly well settled. Thus, a riparian owner is one who owns land on the bank of a river, or one who is the owner of land along, bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a river. Yates v. Milwaukee, 10 Wall 497, 77 U.S. 497, 19 L.Ed. 984 (1870); 1A Thompson on Real Property, § 275; I Farnham, Waters & Water Rights, §§ 62, 63; 56 Am.Jur., Waters, § 277; Bouvier's Law Dictionary (Rawle Ed.) p. 2964; Black's Law Dictionary (4 Ed.) p. 1490. See also Harlan & Hollingsworth Co. v. Paschall, 5 Del.Ch. 435, 453 (1882). And where the intent as to riparian proprietorship is to be determined from

---

6. The "quitt" rent for which was "two bushels and a halfe of good winter wheate".

7. The State's letter dated February 4, 1966.

written instruments alone, it is purely a question of law to be determined by the Court. People ex rel. Burnham v. Jones, 112 N.Y. 597, 20 N.E. 577 (1889).

■ As to boundary disputes, the primary purpose is to track the footsteps of the original surveyor, to locate the survey as it was intended to be located on the ground by him. Moore v. Campbell, Tex.Civ.App., 254 S.W.2d 1018 (1953).

■ Land will be bounded by a watercourse if the conveyance indicates an intent to make the watercourse one line of the boundary. III Farnham, supra, §§ 853 and 854. Natural monuments govern courses and distances when there is a conflict or ambiguity in the description of the grant. Dale v. Smith, 1 Del.Ch. 1 (1814); Conaway v. Isaacs, 5 Boyce 473, 94 A. 769 (1915); St. Clair County v. Lovingston, 23 Wall 46; 90 U.S. 46, 59, 23 L.Ed. 59 (1874).

■ Where the calls in a conveyance of land are for two corners at, in or on a stream or its bank, and there is an intermediate line extending from one corner to the other, the stream is the boundary unless there is something which shows the intent to be otherwise. County of St. Clair v. Lovingston, supra.

The abstracts of the four parcels as to which The Pennsylvania holds record title include some 115 deeds, patents, confirmations, devises, intestacies, partitions and the like. Precise lines are often lost in antiquity and uncertainty results as one attempts to follow the language adopted by ancient (and sometimes recent) scriveners and surveyors. Hence it is impractical, if not impossible, to compare every variation in line and language over the almost three centuries which have passed since York's first colonial Governor gave patent or confirmation to the first settlors. Significant conclusions, however, can be drawn with certainty both from ancient and latter-day documents which are in The Pennsylvania's title chain.

■ First, as to the original patents, these are two in number for present purposes, and both were bounded on the east by the Delaware River. Thus the resurvey of September 10, 1688 has this specific language:

"* * * beginning at a corner black oak, being the southwest corner of Charles Peterson's land *bounded by the River side* on a point called Stone point * * * [by various courses] to a cor black oak *standing by the River, thence up the River, to the place of beginning* * * *." (Emphasis added.)

Under this description, the tract clearly borders or abuts upon the Delaware River and makes it contiguous thereto. And the intermediate line from the corner black oak (standing by the River) to the place of beginning makes the stream the boundary. Extended discussion is not necessary to demonstrate that, by test of all of the authorities cited above, this is riparian land.

■ The other original patent is the confirmation of 1675 from Governor Andross to Charles Petersen:

"* * * beginning at a corner red oake standing by the river syde, *running* North and by East *along the River,* * * * *to a corner white oak* * * *." (Emphasis added.)

Again, by application of the same principles of law, the same result follows. In short, this is likewise riparian land.

■ The State's argument in opposition is based on certain surveys shown in its appendix.[8] One of these indicates that properties shown on them border on the River, others indicate a "space" between the River and a boundary line on the drawing. I regard the latter as not persuasive

8. See, for example, New Castle County Proprietary Warrants & Surveys T–2–1 and 2–2–1a.

on the riparian question for several reasons which I outline briefly:

(1) The State has not shown that these surveys (all of which are dated in the eighteenth century) are in The Pennsylvania's chain of title.

(2) To the extent that there is a conflict between these surveys and the earlier survey, the latter controls. Cannan v. Walker, Tex.Civ.App., 385 S.W. 2d 271 (1965); Snodgrass v. Snodgrass, 212 Ala. 74, 101 So. 837 (1924).

(3) The surveys indicate on their face that they were prepared for the purpose of dividing the property among the several land owners identified thereon without reference to where the River boundary lay.

A second conclusion is that the "more recent" documents in The Pennsylvania's chain of title confirm the riparian nature of the tracts. It may be true, as the State argues, that recent documents are of limited significance unless the land can be traced to original abstracts. But that has been done. And, without exception for at least one hundred years, the descriptions in all recent documents include a course which binds on the River. Extended review or discussion is not necessary because the documents speak for themselves and demonstrate that, in language and in legal import, the lands which they describe are riparian.

\* \* \*

 In summary, by both original patents and by subsequent documents down to the conveyances to the present owner, the lands in The Pennsylvania's title chain bind and border on the Delaware River, and it therefore has the rights of a riparian land owner.[9]

---

**9.** In reaching this conclusion, I have not relied upon the State's admissions and

its motion to vacate them will therefore be granted.

## V

Vexatious problems arising from and in litigation over water rights have been encountered for centuries and the solutions differ widely, dependent upon time, place and circumstance. Much of this is fully discussed by Farnham in his treatise on Waters and Water Rights. Of tidal waters he says, in Volume I, at Page 165:

"Of all the difficult questions which have arisen in the application of the law to questions involving water rights, there is none which has produced more uncertainty, caused greater conflict of opinion, or produced more diverse results than that relating to the land under the waters."

Three distinct classes of property rights evolved in connection with tidal waters: dry upland, land below low water mark, and the land between high and low water mark.

## A. RIGHTS OF A RIPARIAN OWNER IN ENGLAND

The historic evolution and solution of the title to property between high and low water mark in England is discussed at length in the complete briefs of the parties. The Court is referred to policies and precedents as far back as the Saxon kings. But, for present purposes, I note only that in England, at least to the time of Elizabeth I, when a manor which bordered on the sea was granted to a subject, it was assumed by all parties that no land was reserved to the King between the upland and the water. I Farnham, supra, 180.

In the time of Elizabeth I, one Thomas Digges invented, for reasons which Farnham finds both suspect and baseless, a claim of the Crown to the foreshore "in right of prerogative as part of the great

waste of the kingdom not granted out." I Farnham 182.[10]

Whether sound or no, and whether for good or ill, the Digges theory caught on as the writers of English treatises adopted it and, eventually, the English courts did, too. The result is that in England it has become:

"* * * firmly established that the title to shores of tide waters is prima facie in the Crown, and that one who claims title to it has the burden of showing his title." I Farnham 192.

By the time the Crown began making grants in the American colonies, the doctrine of prima facie Crown ownership had become established to the point that when the King granted a charter to sections of land in the colonies, he invested the grantee with all his rights, reserving nothing to himself.

## B. RIGHTS OF A RIPARIAN OWNER IN THE COLONIES

After 1783 many of the colonial colonies now independent states with broad openings on the sea and the great rivers which went down to it, were faced with the problem of deciding upon ownership to the foreshore. The approached differed. In Massachusetts, for example, a statute was enacted providing that a grant of upland would pass title to low water mark at least out to a certain maximum distance. Most states, however, had no such express legislation and the question passed to the courts for decision.

A majority of courts held, at least as to a grant from the state, only that passed which was expressly mentioned, and so foreshore did not pass with a grant of upland. A majority of the courts also held that title of the riparian owner "who claims merely by grant of the upland extends no further than high water mark, unless the

legislature has made some provision for extending it further." I Farnham 209. Rights in the Foreshore, 22 Col. L.R. 706, 733. Farnham criticizes this result, but the significant fact for present purposes is, as he points out (p. 210), that Delaware was in the minority. He says that this State adopted the rule that title to the upland extends to low water mark. And the Delaware cases support that conclusion.

### VI

### A.

There are several reported Delaware decisions in which the Court has held that a riparian owner owns to low water mark or in which it has applied that as Delaware law. In State v. Reybold, 5 Harr. 484 (1854), the Superior Court. said, in charging a jury:

"* * * That a riparian proprietor, or owner of land fronting on a navigable river holds to low water mark. * * *"

In Harlan & Hollingsworth Co. v. Paschall, supra, Chancellor Saulsbury said (5 Del. Ch. at p. 453), citing Reybold and Bickel v. Polk, 5 Harr. 325 (1851):

"Whatever the common law of England might have been, or is now, whatever the law of other States may be, on this subject, I feel bound to recognize as true (at least until the law shall be declared by the court of error and appeals to be otherwise) the law decided by our own law courts, that a riparian proprietor or owner of land fronting upon a navigable river holds to the low water mark."

The State attempts to minimize the impact of these cases by pointing to inadequate discussion of principle in them. But the fact is that the Courts did apply the principle that a riparian owner fronting on a navigable river holds to low water mark, and no Delaware decision has been cited to the contrary. And it is worth

---

10. The Pennsylvania points out in its brief that the Attorney General of Delaware is now advancing "the same theory here to unsettle riparian titles as Charles I advanced in England and which contributed to his being beheaded".

noting that Justice Cardozo in State of New Jersey v. State of Delaware, supra, said that "in Delaware, unlike New Jersey, title to the foreshore is in the riparian proprietor."

■ There are several reasons why, in my judgment, a trial Court should not at this time depart from that principle. First, the age of the cases carries a special import. While it is true that neither decision was by the highest Court in the State, they do represent the only known published Delaware law on this subject and they were the only available guides for the fixing of property rights. And while precedent is not to be followed merely for its own sake, the Courts are seldom at liberty to disregard or set aside a rule of long standing settled by a series of decisions. Shellhorn & Hill, Inc. v. State, Del., 187 A.2d 71 (1962).

■ Second, land titles are involved and this carries its own significance. It has long been the policy of the common law to assign everything capable of ownership to certain and determined owners. And for generations it has been deemed necessary in the public interest to quiet title to land ownership and the letter and spirit of the law have certainly moved in that direction. The preservation of peace and security of society calls for the fixing of lines of demarcation between rights which are public and held in common and others which are private. See the discussion in I Farnham 217. The foreshore is a distinct class of property right in tidal waters and is capable of independent ownership. Under *Reybold and Harlan & Hollingsworth*, our Courts found that ownership to be in the riparian owner and a reversal by this Court now would create unrest as to land titles.

■ More specifically, the maximum of stare decisis finds special application in litigation involving titles to real property, Application of Emmett S. Hickman Co., 10 Terry 13, 108 A.2d 667 (1954); Daniels

v. State, 2 Pennewill 586, 48 A. 196, 54 L.R.A. 286 (1901), and therefore provides a cogent reason for following the rule of *Reybold* and *Harlan & Hollingsworth*. As Justice Herrmann observed in Abbott Supply Company v. Shockley, 11 Terry 261, 128 A.2d 794 (1956), it is almost as important that the law be settled as it is that the law be right. If, however, there is a clear indication that the law applied by trial courts earlier in our history was wrong, then a rule of property may be changed. Bringhurst v. O'Donnell, 14 Del.Ch. 225, 124 A. 795 (1924). But absent that, "A rule of property long acquiesced in should not be overthrown except for compelling reasons of public policy or the imperative demands of justice." Abbott Supply Company v. Shockley, supra. I am unable to say that the rule of *Reybold* and *Harlan & Hollingsworth* was clearly wrong, nor am I aware of any public policy or demand of justice requiring this Court to now abandon it. Any change at this date will have to come from the Supreme Court.

### B.

Both parties rely on the enactment of various statutes as indicating that the Delaware Legislature from time to time has and has not recognized the title of the State to the foreshore of the Delaware River. Thus The Pennsylvania recites the enactment in 1955 by the Legislature of a statute authorizing a conveyance of subaqueous land beyond low water mark to Tidewater Associated Oil Company. 50 Del.L., Chapt. 337. (Nothing was said in the Statute about the foreshore.) And the State points to the exclusion of "salt marsh, beach or shore" from public lands which a person could claim after adverse possession for twenty years. 7 Del.C. § 4502 (repealed in 1953).

None of the statutes or legislative acts directly involve the lands in controversy. Some of the statutes deal with specific rights, others reflect a public policy as to certain areas of River front. But it

would be reading too much into any of them, singly or collectively, to ascribe to General Assemblies meeting at various times over a hundred years, any public policy with respect to title to the foreshore here involved. In short, I do not read the statutes as claiming or abandoning State title to the lands in controversy.

### C.

Arguments also are made that the Executive Branch of the State Government has and has not acknowledged that a riparian proprietor holds title to low water mark. It is contended, for example, by The Pennsylvania that the Governor made such an acknowledgment when he approved the law conveying title to the Tidewater Associated Oil Company, 50 Del.L., Chapt. 337 and, when acting under 7 Del.C. § 4520, he granted long-term leases for offshore underwater lands in the Delaware River to certain riparian owners. The Pennsylvania also contends that in State of New Jersey v. State of Delaware, supra, the Attorney General took the position that under Delaware common law title to the foreshore of the Delaware River to low water mark was held by the owners of lands fronting thereon.

I find such arguments neither controlling nor persuasive.

### D.

The Pennsylvania contends that long possession by it and its predecessors under instruments of title described in the abstracts presumes a proper grant. The State argues that The Pennsylvania's title instruments do not run to low water mark and, furthermore, that there is a presumption that the State does not grant any more subaqueous land than is clearly established that it intended to grant.

According to a Superior Court case decided more than a century ago, a patent or grant from the State has been presumed on proof of a warrant and long possession. Wall's Lessee v. McGee, 4 Harr. 108 (1844). But in view of the ruling I have made with respect to riparian title, I do not have to decide if the Railroad gets the benefit of a presumption. In addition, there may be some question as to whether the present record supports a claim of possession for years out to the fill line.

### E.

The Pennsylvania contends that any claim by the State to the foreshore is barred by 9 Del.L., Chapt. 403, § 2,[11] while the State argues that adverse possession cannot run against the State without its consent.

In view of the ruling made with respect to riparian ownership, it is not necessary to rule on this contention. In addition, there may be some question as to whether the present record supports the Railroad's claim of possession for years out to the fill line.

### F.

As I have already indicated, the State relies on the strength of its own title, as well as weakness in The Pennsylvania's, and that strength in turn is bottomed on the title chain which prevailed in State of New Jersey v. State of Delaware, supra.

In the interstate litigation the Supreme Court held that a good record title had been made to Penn and his successors (when reinforced by the patent of 1683) and had been confirmed by a century of undisturbed possession to the time of the

11. That statute provided:
" * * * a continued uninterrupted and peaceable possession of any lands and premises in this State for the space of twenty years, by any person or persons * * * shall be and enure as a complete and effectual bar to any claim of title on the part of the said State to the said lands and premises; notwithstanding no warrant, survey, patent or grant have been made for the same * * *."
Beach, shore and salt marsh were excluded from this statute by the Code, 1852, p. 30, 7 Del.C. § 4502. The entire law was repealed in 1953. 49 Del.L. Chapt. 386.

Treaty of Paris in 1783 when the land within the circle was part of the territory of Delaware. Title at that time was thus in the Penns or persons claiming under them.

But in that litigation the Court was concerned with the boundary line for governmental purposes, and proprietary purposes only as they concerned the two litigating States. Certainly there is nothing in the opinion to indicate that the Supreme Court was adjudicating title to foreshore on the west side of the River or rights as between Delaware and her riparian landowners.

■■■ At this point it is appropriate to sum up and state my conclusions with respect to title to the foreshore in question:

(1) The two basic patents in The Pennsylvania's title chain do not run the boundary of the property to low water mark and thus do not specifically include the foreshore. But they do run the boundary to and along the Delaware River and thus the land is "riparian".

(2) By application of the rule of law announced in *Reybold* and *Harlan & Hollingsworth,* The Pennsylvania as a riparian owner fronting on the navigable River Delaware holds to low water mark and thus its title includes the foreshore.

(3) Literally dozens of subsequent documents in The Pennsylvania's chain of title confirm its holding to low water mark.

(4) The basic patent from Edmond Andross, Governor of York and Albany, to Charles Petersen, was given under date of November 5, 1675 and included this description:

"Whereas there is a certain parcell of land *scituate and being on the West side Delaware River,* the which by vertue of a warrant hath been layd out for Charles Peterson. The said land lying on the North side of Verdrity's hook, *beginning at a corner red oake, standing by the river syde, running North and by East along the River,* one hundred thirty eight perches or poles to a corner white oak * * *."* (Emphasis added.)

This patent was dated seven years prior to York's grant to Penn (in 1682) and, for this reason alone, The Pennsylvania's title to this part of the riparian lands is superior to the State's.

(5) The other basic patent, as shown on the September 10, 1688 survey, follows the grant to Penn by six years. But this was a "resurvey" according to a "former survey made by Edmond Cantwell" [12] and prior instruments in The Pennsylvania's title chain (which stand undisputed) show grants or confirmations of 1667 and 1670. While these latter do not contain specific metes and bounds, a reasonable inference from all three documents (1688, 1670 and 1667), considered in the chronology in which the changes of government and proprietorship took place, is that the same riparian land was involved in all patents, the first of which antedates York's grant to Penn.

## VII

I have determined that The Pennsylvania holds title to low water mark in the Delaware River and I now turn to the question as to how that point is to be located.

In Harlan & Hollingsworth Co. v. Paschall, supra, the Chancellor defined "shore" as the "land between the high and low water marks" (5 Del.Ch. p. 464). That definition is general and further refinement is necessary so that the area here involved may be fixed with certainty.

Obviously the area of foreshore follows from the position of its boundaries, that is, the location of high and low water marks. And as to these, definitions vary. It has been said, for example, that high water mark is the "line on the shore reached by the water at the high or flood tide"; and

---

12. See the specific language on the face of New Castle County Proprietary Warrant & Survey T–2–15a.

low water mark is the "line on the shore of the sea which marks the edge of the waters at the lowest point of the ordinary ebb tide". Black's Law Dictionary (4 Ed.) p. 1763. But such definitions are based either on limited observations which give a result that may be unfair to one or both parties, or they are not complete enough to be helpful.

The briefs and letters of counsel indicate some difference over how low water mark (or ordinary low water mark or mean low water mark) should be defined. But both parties are seemingly agreed that it should be based on a series of observations made over an extended period of time. The Pennsylvania suggests nineteen years, the State, "some given time, such as a year".

■ To minimize the effect of celestial conditions, drought and flood, and to bring into perspective the special time period involved in this case (filling began in 1946), I conclude that the low water mark to which The Pennsylvania's title runs is mean low water mark, which is the average daily height of all low water marks over a twenty-three year period beginning January 1, 1942. This is somewhat longer than the nineteen-year period suggested by Shalowitz, 1 Shore and Sea Boundaries, 88, but he recognizes that a "considerable period of time" is what is called for. Compare Borax Consolidated v. City of Los Angeles, 296 U.S. 10, 56, 56 S.Ct. 23, 80 L.Ed. 9 (1935); and Luttes v. State of Texas, 159 Tex. 500, 324 S.W.2d 167, 179 (1959). And see II Farnham § 417.

If observations are not available for the period which I have specified, or if the use of the twenty-three-year time period presents unusual problems, counsel are to call that matter to the Court's attention.

It follows from the foregoing that the precise determination of the low water mark

to be fixed in this case must await further proceedings.

## VIII

In addition to differing as to the location of low water mark, the parties also disagree as to the extent of The Pennsylvania's filling operation and the effect this has had on the location of the foreshore.

The affidavit of J. W. Wallenius filed by The Pennsylvania shows "mean low water mark" within 800 feet of the river rail and states that "All fill which has been placed since 1946 * * * upon the lands in controversy has been confined to an area, the easterly limits of which are 600 feet east of the river rail * * * for the whole length of said filling operation, which is to the west of and above the mean low water line of the Delaware River".[13]

The affidavit of Werner C. Lehm filed by the State flatly asserts that the "effect of the filling operation is to change the location of actual mean low water mark to positions in some locations easterly of those they had prior to the filling operation". And Mr. Lehm also states that fill has been placed east of the actual mean low water mark as fixed by a United States Corp of Engineers Survey of 1954.

The State also filed the affidavit of S. Marston Fox which is to the effect that filling has been made by the Railroad and is continuing to be made beyond and below mean low water mark.

■ There are obvious conflicts in the affidavits which raise material issues of fact and, for this reason alone, the Railroad's motion for summary judgment must be denied.

## IX

The Pennsylvania contends that there are no public rights of fishing or navigation in the foreshore here at issue and thus there

13. The Pennsylvania's drawing which is a part of Mr. Wallenius' affidavit was apparently traced from a 1942 survey by the United States Engineer's Office.

is no legal reason why it may not fill to its property line, i. e., low water mark.

As to navigation rights, the Railroad argues that since the Corps of Engineers issued its permit for the land fill operation upon its determination that it would not interfere with public navigation in the River, neither the State nor any member of the public is competent to declare otherwise. And as to fishing rights, the Railroad contends that the principle announced in Bickel v. Polk, supra, was modified by a compact entered into between Delaware and New Jersey in 1905. 7 Del.C. § 901.

### A.

The permission given by the Corps of Engineers to The Pennsylvania was an extension of the 1946 permit and is contained in a letter from the District Engineer (of the Corps of Engineers) to the Railroad dated April 20, 1962. That letter reads in part:

"Your attention is invited to the fact that this permit does not give any property rights either in real estate or material, or authorize any infringement of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining State assent to the work authorized. It merely expresses the assent of the Federal Government so far as concerns the public rights of navigation. In this connection, you were notified by the District Engineer by letter dated 30 January 1956 that the Delaware State Highway Department had requested this office to inform you that, under the laws of the State of Delaware, title to riparian lands involved must be obtained from the State prior to commencement of work."

It is pertinent to note here that it is not necessary to decide if the United States Government, acting through the Corps of Engineers, *could* give The Pennsylvania a permit to fill irrespective of State action or wishes in the matter. That is not this case. Permission, not command, is here involved. The permit "merely expresses the assent of the Federal Government so far as concerns the public rights of navigation."

■■■■■ Under the Federal Constitution navigation in the Delaware River is subject to the control of the United States Government. And when it declares a structure to be lawful the State cannot declare it unlawful as interfering with navigation. 56 Am.Jur., Waters § 223. And so here, the Corps of Engineers, acting under 33 U.S.C. § 403, declares it lawful for the Railroad "to construct a dike and to fill behind same" and therefore the State cannot declare it unlawful "so far as concerns the public rights of navigation." If it did it would be on a collision course with the Federal Government and so would be overridden by the latter's paramount authority in the area of public navigation. In short, the permit, because of its origin (from the Federal Government) and language, effectively eliminates any objection to the filling based on the right of the public to navigate in the waters over this foreshore. But the permit language makes it equally clear that it is not a mandate to the Railroad—it is permission only—and that the Federal agency's action does not "obviate the necessity of obtaining State assent". What such assent is required? For reasons already indicated, it is not an assent waiving public rights to navigate.

### B.

In Bickel v. Polk, supra, Chief Justice Booth said:

"The right of fishing in all public streams where the tide ebbs and flows, is a common right, and the owner of land adjoining tide water, though his title runs to low water mark, has not an exclusive right of fishing; the public have the right to take fish below high water mark, though upon soil belonging to the individual, and would not be trespassers in so doing; but if they take the fish

above high water mark or carry them above high water mark and land them on private property, this would be a trespass; but the damages would be merely nominal, as for an illegal entry; it being agreed in the argument that there was no other injury. In all navigable rivers, where the tide ebbs and flows, the people have of common right the privilege of fishing, and of navigation, between high and low water mark; though it be over private soil."

The Pennsylvania argues that this rule of public access was modified by 7 Del.C. § 901, etc., which reads (at § 902) as follows:

"(a) The inhabitants of the States of Delaware and New Jersey shall have and enjoy a common right of fishery throughout, in and over the waters of the Delaware River between low water marks on each side of the river between the two States, except so far as either State may have granted valid and subsisting private rights of fishery prior to March 16, 1915."

This statute originally appears as 24 Del.C., Chapter 146 and was enacted in 1905, apparently to resolve differences between New Jersey and Delaware over the right of the citizens in each State to fish in the waters of the other. The State therefore argues that it has a limited purpose and should not be interpreted to modify the rule of *Bickel.*

But the difficulty with the State's argument is that the plain language of the statute has a broad public scope; it applies, for example, specifically "to the catching and taking of fish in the water of the Delaware River". § 901. It states that the "inhabitants" of each State "have and enjoy a common right of fishery throughout in and over the waters of the Delaware River between low water marks". § 902. The inhabitants of each State, without exception, are given the right to fish. And fishing is limited to the area between low

water marks. And the statutory detail indicates quite plainly to me that it is the comprehensive plan which it purports to be —a uniform law regulating the catching of fish in the Delaware River and Bay.

While differences with New Jersey may have led to enactment of the law, I cannot for that reason limit its application to disputes arising out of or with respect to the fishing rights of non-Delawareans. The very general language of the statute itself strongly indicates a broader purpose.

I conclude that the effect of 7 Del.C. § 901 is to eliminate the common law right which inhabitants of Delaware had under *Bickel* to fish up to high water mark in the River. Any other construction would of necessity mean that for fishing purposes the River is divided into at least two separate categories: an area between low water marks common to the inhabitants of both States, and an area to high water mark in which only Delaware inhabitants may fish. And possibly a similar area would be carved out on the New Jersey shore. The enforcement problems which such a construction of the statutes would raise are obvious.

### C.

On the question of public use of waters over the foreshore the briefs of counsel are limited to the rights to navigate and fish. I have considered each of these and have concluded that The Pennsylvania's right to fill in the foreshore is not limited by public right to navigate or fish in its waters.

But, when this has been said, I am not certain that the entire area of state power to control use of these waters has been exhausted. In short, I am not satisfied, as yet, that, under Delaware law, fishing and navigation are the only uses which the public may make of these foreshore waters. Implicit in this *quere* are two questions: What *power* has the State, if any, to control or regulate use of this foreshore? And, if it has such power, has

it *exercised* that power in a way that precludes this filling operation without State consent?

On the question of Delaware's power to regulate as to use of navigable waters, it is said, at 65 C.J.S., Navigable Waters § 10b:

"Unlike the federal government, a state in the regulation of navigable waters, is not limited to regulations for the purpose of navigation and commerce, but may regulate and control navigable waters for any purpose within the scope of its sovereign, governmental, and police powers * * *."

And as to obstructions in navigable waters, the same text says, at § 11b, that "Under most authorities, a state, in the absence of action by the federal government, may *authorize or prohibit obstructions in navigable waters.*"

In New York it has been held that State power to limit as to use of navigable waters extends to every form of regulation in the public interest. Andrews v. State, 19 Misc.2d 217, 188 N.Y.S.2d 854 (N.Y. Court of Claims 1959); People v. System Properties, 281 App.Div. 433, 120 N.Y.S.2d 269 (1953). Massachusetts law is to the same effect. See Home for Aged Women v. Commonwealth, 202 Mass. 422, 89 N.E. 124, 24 L.R.A., N.S., 79 (1909). In Pennsylvania the title of the abutting riparian owner apparently runs to low water mark "subject to the rights of navigation, fishery, and improvement of the stream * * *." Black v. American International Corporation, 264 Pa. 260, 107 A. 737 (1919). And a Federal trial court has held that a State's power to control use of its navigable waters is equal to its power to control its highways. Franklin v. Tomlinson Fleet Corp., D.C., 158 F.Supp. 850 (1957). Closer to home, in Harlan & Hollingsworth Co. v. Paschall, the Chancellor said (5 Del.Ch. at page 453) that " * * * riparian rights are always subject to state regulation".

But it should also be noted that in State of New Jersey v. State of Delaware, supra, the Supreme Court, in discussing the *jus publicum,* assumed that this was limited to the "right to navigate and fish".

I refer to these cases to indicate the reason why I inquire about a residuum of State power over use of the foreshore and to give counsel an opportunity to comment on their applicability. Further briefing may also be necessary on the preemption question.

The first question, then, is whether or not Delaware has any power to legislate with respect to the waters in the foreshore here at issue, other than for purposes of fishing and navigation. If Delaware has no such power, then presumably that will be the end of the matter. But if the State does have such power, then the second question appears: has it exercised that power in such a way as to preclude the Railroad from building the dike and backfilling behind it without State consent?

The briefs of the parties refer to certain State statutes which may have some relevency to this question, but they were cited and argued in reference to the State's claim to title; there was limited discussion, if any, as to how the statutes apply to the regulatory question which I have raised.

As to the regulatory purpose, the Supreme Court of Minnesota, in Nelson v. DeLong, 213 Minn. 425, 7 N.W.2d 342 (1942), has given that a very broad interpretation in Minnesota saying:

" * * * Public use comprehends not only navigation by watercraft for commercial purposes, but the use also for the ordinary purposes of life such as boating, fowling, skating, bathing, taking water for domestic or agricultural purposes, and cutting ice."

And in the same case the Court indicated the equally broad action available to a

riparian owner when the State has not exercised its rights:

" * * * Absent exercise of the state's paramount rights, a riparian owner not only may build and maintain, for his own use and that of others claiming under him, wharves, docks, piers, * * * but he may also transfer such rights, * * *"

In the further proceedings required in this case counsel will be given an opportunity to indicate what State action, if any, regulates public or private use of the foreshore waters here involved. In this connection, I call attention to 17 Del.C. § 142 and 23 Del.C. § 1104.

\* \* \*

For the reasons stated above, The Pennsylvania's motion for summary judgment must be denied. It is so ordered.